Savage and James v. The State—Syllabus.

CHARLES H. SAVAGE AND HOWARD E. JAMES, PLAINTIFFS IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. It is necessary that all criminal prosecutions shall be conducted " in the name and by the authority of the State," but it is not essential that an indictment shall recite those or equivalent words. It is enough that the record shows that the prosecution is so "conducted."

2. It is within the discretion of the court to allow a plea of not guilty to be withdrawn for the purpose of pleading in abatement. The general rule is that a plea in abatement must be put in before pleading in bar.

3. A motion to quash a venire for petit jurors should be sustained by direct evidence. An affidavit alleging facts upon information and belief is not sufficient.

4. Where two are jointly indicted and tried for a capital offence each of them is entitled to twenty peremptory challenges on empannelling a jury, but the State can have but five.

5. When the court directs the summoning of persons, by a special venire, "from the county at large," and not from "by-standers," it is discretionary to reject those who have been in attendance upon the court as "by-standers," and as not included in the terms "from the county at large." This distinction is contemplated by the statute.

6. It is not error to allow a party to withdraw a peremptory challenge and then to challenge the same person for cause : *Provided*, The person is present to be examined, or if it be shown that he is disqualified by law from being a juror. If the challenge for cause is not sustained the peremptory challenge must stand.

7. It is not proper to allow a person called as a juror to be questioned as to whether a verdict in favor of one party would affect his social standing in the community, or produce social ostracism against him.

8. A person is not disqualified to be a juror in a capital case because he is opposed to capital punishment, unless to find a verdict of guilty would violate his conscientious convictions on the subject of capital punishment; but the Judge is to determine the question from the evidence on the subject before him.

9. When the record fails to show upon whose motion a person is set aside as a juror, this court will not decide whether certain questions asked of him upon his *voire dire* were proper.

10. In the cross-examination of a witness who had testified to the fact of an encounter between the accused and a person who had been injured, the witness being present, the question whether he had observed marks of violence upon the person of either is a proper cross-examination, though the witness has not testified upon the particular fact embraced in the question. All the facts and circumstances connected with the matters of the direct examination may be inquired into upon the cross-examination.

11. In proving dying declarations only such statements should be received as evidence as relate to what actually transpired, who were the actors, the position of persons, what was said by the parties, what were the instruments used, who used them and how, and like matters, excluding, if possible, everything except what relates to the *res gestæ.*.

12. Testimony tending to show that during the encounter, which resulted in the death, one of the accused snapped his pistol at a person not engaged in the difficulty is not objectionable. Everything done by the parties at the time may be proved.

13. In charging a jury in a trial for murder the direction that if the accused drew his pistol under circumstances stated and "intentionally shot P., killing him," it is murder in the first degree, is not correct; the instruction should be that if the accused shot P., intending to kill and did kill him, under the circumstances it was murder in the first degree.

14. The charge to the jury on a trial of two persons for murder, one, S., as principal, and the other, J., as principal in the second degree, that if J. was present, aiding and abetting, he was guilty of the same offence, murder in the first degree, is erroneous; it should be shown that the person aiding and abetting, in order to convict

him of murder in the first degree, knew or believed that the principal intended to kill, or that the person aiding and abetting acted upon a premeditated design to take life.

15. Under our statute in relation to homicide, if there is sufficient deliberation to form a design to take life and to put that design into execution by destroying life, there is sufficient deliberation to constitute murder in the first degree. The question of premeditation, like other facts, is for the jury.

16. In cases of conviction of a capital offence, the sentence of the court, under the statute, should be that the prisoner be remanded to a place of safe keeping, &c., (in the usual form,) and that he be hung by the neck until he is dead, at such time and place as the Governor of the State by his warrant shall appoint. The act of 1868 requires the warrant of the Governor to be executed within the walls or enclosure of the jail or prison in the county where the prisoner is confined when the warrant is issued.

Writ of Error to the Circuit Court for Hamilton county.

The Plaintiffs in Error were indicted for the murder of Frank P. Paterson, the former as principal in the first degree and the latter as principal in the second degree. The indictment was found in Madison county, at the Spring term of the Circuit Court for the year 1881. The case was removed on application of the Plaintiffs in Error to Hamilton county, where they were convicted of murder in the first degree at a special term of the Circuit Court held in June.

The second assignment is the overruling of motion of the defendants for leave to withdraw the plea of not guilty and to file a plea in abatement.

The record shows that the plea of "not guilty" was made on the arraignment in Madison county *April 19, 1881*, at the term convened April 11th. The petition was filed at special Hamilton term (*June 13th*), and on the same day the State moved to strike such petition from the files. The petition, which is under oath, is in substance that defendants were poor and could not employ counsel to defend

them until a very few days before the court convened in
Madison, and consequently counsel did not have time to
inform and prepare themselves for the defence before de-
fendants were required to plead to the indictment; that
they plead the day following the presentation of the in-
dictment; defendants are colored men of the African race,
and formerly slaves, and were set free by results of the
war; the County Commissioners of Madison county, who
selected the jury list of 300 for the year 1881, " were white
men, who were formerly slave-holders, and were by educa-
tion and society taught to regard the African race as an
inferior race and not entitled to equal rights and privileges
with white men;" that there are 800 colored registered
voters in Madison county of approved integrity, fair char-
acter and sound judgment and intelligence, and in all re-
spects qualified to serve as jurors; that colored voters ex-
ceed white voters by 500, still only 38 colored voters were
chosen on the list of 300; colored persons should exceed
half the 300; that this unjust exclusion of them was on
account of their color and former condition of servitude; the
grand jury which indicted defendants was drawn from such
list, and defendants have been practically denied the equal
civil rights and privileges of citizens of the United States,
guaranteed to them by the United States and State Con-
stitutions, to prevent discriminations against any citizen
on account of race, color or previous condition of servitude.
The prayer is for leave to withdraw the plea of not guilty
and plead the above allegations in abatement.

The State moved to strike out the petition on the grounds
that—

1st. The defendants had waived all matters in abatement
by failing to bring them to the attention of the court at an
earlier stage.

2d. The right to so withdraw was adjudicated at last
term of the court.

3d. The petition is false in every material particular, and unnecessarily encumbers the record.

This motion to strike was supported by an affidavit of Frank W. Pope to the effect that from his personal acquaintance with the County Commissioners who selected the list of 300, dated from a long period of time, and with some for a number of years, he can unequivocally and unhesitatingly deny the allegation made that they failed to include more than 38 colored men on account of their color; that there was at least one colored man on the grand jury. Affiant believes County Commissioners had no disposition or intention to discriminate against defendants, or other colored men, in selecting the 300, but that they acted uprightly and honestly in such matter. Two of the Commissioners were not slave-holders.

The court overruled the motion to strike, and denied the motion of the defendants.

The sixth assignment is that there was error in not granting defendants' motion to quash the regular venire for the petit jury.

The grounds of this motion are—

1st. The venire was not drawn according to law.

2d. The County Commissioners in selecting the list of 300 discriminated against colored men on account of their race, color and previous condition of servitude, and it had been the custom to so discriminate for the past four years.

The motion was supported by affidavit of defendants, to the effect that there are at least 200 colored men in Hamilton county who are persons of approved integrity, fair character and sound judgment and intelligence, and in all respects qualified to serve as jurors; that out of said 200 colored men all have been wilfully excluded, as affiants *are informed and believe*, from the list of 300, except six; that the whole voting population, as affiants are *informed and be-*

*lieve,* is about 1,300, and that the discrimination in refusing to place a larger proportion of colored men on said list was on account of their race, color and previous condition of servitude, and it has been the custom in this county for the past four years to thus discriminate; and further, there are about 350 colored registered voters in such county; and this affidavit *is made on reliable information.*

In further support of said motion, defendants read the record of the drawing of the venire. It shows that on May 18, 1881, at 11 o'clock, due notice having been given according to law, and proclamation having been made by the Sheriff, and the County Judge, Clerk and Sheriff being present, the names of eighteen good and lawful men were drawn by the Sheriff, County Judge and Clerk, &c., and a *venire facias* issued by the Clerk.

In opposition to the motion, the State Attorney filed an affidavit denying that any discrimination was made by the Commissioners, or that they were actuated by any motives or feelings of prejudice against defendants, or other persons, on account of race, color or previous condition, but they acted fairly, impartially and without prejudice or discrimination in the matter, and denies that colored persons were excluded from the list on account of race, &c.; and says there are two colored men on the special venire; and denies the four-year allegation, and that as to the venire not being drawn according to law. The State also offered a certificate from the Clerk of the Circuit Court, o the effect that the record of the drawing was *erroneous,* and that he drew the venire himself in the presence of the other officers mentioned.

The defendants objected to the filing of the certificate, and the objection was overruled, but afterwards, the defendants having moved to strike out the traverse of the State Attorney on the ground that it was not sufficient or

responsive to defendants' affidavit, the court sustained the motion in so far as the affidavit or traverse is to be considered as evidence in reply to the affidavit of defendants, but refused to strike it from the files, for the reason that it is urged by the State to show that the facts stated by the affidavit of accused are not admitted but denied.

The court refused to quash the venire.

The thirteenth, fifteenth and sixteenth errors assigned are the refusal of the court to permit the counsel for the accused to ask E. C. Jones, Knight, McCullens and Lee, called as jurors, the questions stated in the seventh and ninth subdivisions of the opinion.

Of these three jurors, however, Knight alone was selected and served. How the others were disposed of, whether by peremptory challenge of defendants or State, or how, the record does not disclose.

The court refused to permit the defendants to ask one Lee, who was called as a juror: "Is there such a bias on your mind that you would require evidence to remove it before you could render a verdict contrary to your present opinion?" It was objected to, and the objection sustained, because he had already been asked if he was "sensible of any bias, prejudice or ill-will against the accused," and had answered in the negative, and besides, the question assumed that he had bias when he had disclaimed having any. Lee was not taken on the jury. The record does not disclose why he was not.

The testimony as to dying declarations discussed in the eleventh sub-division of the issue is as follows:

C. T. Coyle testified on behalf of the State as follows: I live in Madison county, Florida, at Greenville. On February 8, 1881, I was at Madisonville, Fla.; reached that place about 11 o'clock A. M. I knew Paterson; saw him on that day in Judge Witherspoon's office, and had a con-

versation with him. He was in a dying condition. I know he was because blood was coming out of his mouth; he was lying on a bed, and said he was shot. I asked him if he was hurt, he said he was killed, he was dying. He died in about half an hour I suppose after making this declaration. He was not able to stand up. He could not speak a sentence, the blood choking him; he had to stop to swallow. I asked him who shot him. He told me. His declaration was not reduced to writing. He said Savage shot him twice and James once. He raised his left hand and said James shot him in that, (showing the finger next to the forefinger) and that Savage shot him in the body, putting his hand on the place. Did not notice the size of Paterson's finger. Noticed the wound in the finger. Noticed it as I had his hand in mine that it was a small ball made it. I know Savage and James (points them out). Paterson stated other facts and circumstances concerning the killing that happened at the killing. I asked Paterson if he shot either of the parties, Savage or James, and he said he did not. I asked Mr. Paterson if he had a fight with Savage and James, (counsel for the accused object to giving Paterson's answer, on the ground that it is not a part of the *res gestæ*, overruled and excepted to by accused,) he said no, that Savage grabbed him and shot him. The conversation stopped.

Cross-examined:

No one was present but me and Paterson at that time (the dying declarations). I have stated as near as I can recollect every word that was said. He (P.) could not talk continuously. His (P.'s) mind was clear. He only answered the questions when I asked him. Paterson did not say that he made any remark to Savage. Paterson was suffering a very great deal at that time. He said he was suffering terrible pain and agony. Personally I have no feeling against the accused.

Caraway Smith, a witness called for the State, testified as follows: I knew Paterson in his life-time. I know Savage and James. Paterson is now dead. He died 8th February the present year; saw him a short time, about an hour before he died. He was in a dying condition. Saw P. when he was coming out of the court-room after he was wounded, and when he was lying in Judge Witherspoon's room. I conversed with him in meeting him at the court-room door. I asked him if he was hurt, he replied, "yes, my God, I am shot to death." I said no, you are not hurt much. He said, "yes," placing his hands to his breast, "my God, I am shot to death." After he was on the bed in Judge Witherspoon's room he repeated the same words, adding, "I have been robbed of my life." He said Savage and James shot him. Do not remember that he gave their given names. The coat-sleeve of Paterson was on fire when I met him at the court-room door. I examined coat-sleeve and found bullet-hole, at least what I supposed was a bullet-hole. The hole was as large as my thumb, and was burning.

Cross-examined:

It was not over two minutes after the shooting when 'Paterson made the declaration that Savage and James shot him. No one was present but myself. Paterson and I were alone, not longer than the time occupied by the conversation which happened between us. No other one heard the declaration as I remember. The declaration I mean was the one that P. made to me, of which I testified, to-wit: that Savage and James shot him. C. W. Stevens was with P. at the court-room door when I met him. Mr. Stevens was walking at P.'s side, if I remember correctly, and I think he (Stevens) had hold of his arm.

Joel E. Philips, a witness for the State, being sworn testified as follows: I knew Paterson in his life-time. He is

dead. I had a conversation with P. about a half an hour before his death. He was on the bed in the back part of the office. I asked him where he was shot. He placed his hand on the wound, and said he was robbed of his life by Savage and James, and had nothing to defend himself with. I had hold of his hand at the time. He said good-bye, I am dying, and asked me to get him a doctor. Had no further conversation.

The twenty-first error assigned is the court's overruling the objection to the following questions, put to State witness, O. F. Florid, by the State Attorney, and to his answers: " When you went up towards where Savage, Paterson and James were having the difficulty, did James do any other act with his pistol other than you have stated ?" He answered " yes." " What was it ?" Answer: "James drew his pistol on me, and snapped it at me when I went up." Mr. Florid's testimony shows that the " snapping " at him took place at the time of the other shooting ; he says it was between the second and third shots.

The twenty-second error assigned is as follows : A State witness, Brinson, had stated that on the 7th of February, 1881, (the day before the killing) he saw Savage and James get off the train, and that his attention was attracted by their having certain kind of guns, the like of which was exhibited in court. The State Attorney asked : " Did you ever see any other colored man about Madison with such guns as this ?" The accused objected to the question, and it was overruled. " I never did," was the answer. No objection had been taken to the testimony as to seeing the prisoners with the guns, &c.

The twenty-third assignment is that the court erred in sustaining objections of the State to three separate questions asked by the accused of the witness, S. M. Hankins, called in their behalf. The first question was, " whether

or not, on account of their extreme political views and utterances, any prejudice or ill-feeling grew up against the accused among their political opponents?" And the second was, " whether or not, on account of any conduct or action of defendants, *subsequent to the last general election,* any ill feeling grew up among certain of their political opponents, and whether or not threats against them were freely indulged in by such opponents on account of such conduct?" And the third was, " whether or not the defendants, or either of them, preferred charges or were instrumental in procuring indictments in the District Court of the United States, Northern District of Florida, against any person in Madison county for alleged violation of election laws at the last general election, and whether or not, on account of such indictments, any ill feeling was entertained by citizens of Madison county, and particularly by the deceased, Frank P. Paterson, against the defendants, and whether or not threats were made against them by such citizens, and particularly by Paterson?" The first two questions were overruled. As to the other, the court overruled it as a whole, but held that that part of it in regard to the conduct of Paterson to be unobjectionable as a separate question.

The other facts are stated in the opinion.

*A. A. Knight, P. W. White* and *J. N. Stripling* for Plaintiffs in Error.

The *first error* assigned is that the court erred in not allowing the defendants to withdraw their plea of " not guilty " and file a plea in abatement.

The style of process in this case is in the name of " The State of Florida."

We understand that there is nothing in the indictment which indicates that this prosecution is conducted " in the

*name* and by the *authority* of the State of Florida." See Wrockledge vs. State, 1 Iowa, 167 ; Harriman vs. State, 2 G. Green, (Ia.) 270 ; State vs. Gleason, 12 Fla., 247–8 ; Exparte Nightingale, 12 Fla., 272.

The *second error* assigned is that the court erred in not allowing the defendants at the special term, commencing June 13, to withdraw their plea of " not guilty " and file a plea in abatement.

In the case of Neal vs. Delaware, Supreme Court of the United States, 13th Otto, page 370, the plaintiff in error was; like the defendants, of African descent. He was indicted in the Court of General Sessions of the Peace and jail delivery of New Castle county, Delaware, for rape.

The plaintiff in error, in the petition which he filed for transfer of his cause to the United States Circuit Court, alleged that all colored persons were excluded from serving as jurors on account of their race and color.

It was admitted in this case that colored persons had always been excluded from juries in the courts of Delaware. " 6. The exclusion, because of their race and color as citizens of African descent, from the grand jury that found, and from the petit jury that was summoned to try the indictment, if made by the jury commissioners, without authority derived from the Constitution and laws of the State, was a violation of the prisoner's rights, under the Constitution and laws of the United States, which the trial court was bound to redress ; and the remedy for and failure in that respect is ultimately in this court upon writ of error."

" 7. Upon the showing made by the prisoner, the motion to quash the indictment and the panels of jurors should have been sustained."

It was not claimed in the above case that citizens of African descent were excluded from the grand and petit jury

by any authority derived from the Constitution and laws of Delaware.

Their exclusion was by the act of the jury commissioners. The petition of the defendants, Savage and James, alleges a similar condition of things, as far as these proceedings against them are concerned. In the case of Neal, the jurors by whom he was indicted, and by whom he was put on trial for his life, were exclusively from the white race. In the case at bar, it is alleged that in the county of Madison there are at least eight hundred colored registered voters, in all respects competent to serve as jurors; that the colored registered voters are some five hundred in excess of those of the white; that out of the three hundred selected as jurors by the County Commissioners to serve as grand and petit jurors, there were only some thirty-eight colored men selected; and that this unjust discrimination made against the colored registered voters was on account of their race, color and previous condition of servitude; and according to the affidavit of Mr. Pope there was only one colored person upon the grand jury which found the indictment against Savage and James.

In this State the exclusion of citizens of African descent from the grand and petit jury does not arise from any authority derived from the Constitution and laws of the State of Florida, but if any such exclusion occurred in this case it is the act of the Board of County Commissioners.

We claim that there was to all intents and purposes as complete and thorough exclusion of colored men from the jury in the county of Madison as in the State of Delaware, and for the same reasons. The question is, did the County Commissioners of Madison county discriminate against the colored voters in said county in the selection of the three hundred jurors? The petition of the defendants, which we claim is uncontradicted, answers affirmatively the interrog-

atory. Therefore, the defendants should have been allowed to withdraw their plea of not guilty, and plead the matters alleged in their petition in abatement. The court says in the case of Neal vs. Delaware, page 394, as follows: " Although for the reasons we have given the prisoner was not entitled to a removal of this prosecution into the Circuit Court of the United States, he is not without remedy if the officers of the State charged with the duty of selecting jurors were guilty of the offence charged in his. petition. A denial upon their part, of his right to a selection of grand and petit jurors without discrimination against his race, because of their race, would be a violation of the Constitution and laws of the United States, which the trial court . was bound to redress. As said by us in Virginia vs. Rives, *supra*, ' the court will correct the wrong, will quash the indictment, or the panel; or if not, the error will be corrected in a superior court, and ultimately in this court upon review.'

" We repeat what was said in that case, that while a colored citizen, party to a trial involving his life, liberty or property, cannot claim as matter of right that his race shall have a representation on the jury, and while a mixed jury, . in a particular case, is not within the meaning of the Constitution, always or absolutely necessary to the equal protection of the laws, it is a right to which he is entitled, that in the selection of jurors to pass upon his life, liberty or property, there shall be no exclusion of his race, and no discrimination against them, because of their color."

These defendants were on trial for their life, they were lately emancipated, were poor and friendless, they had been indicted and almost immediately compelled to plead. After arraignment, owing to the excited and prejudiced condition of the community in which the alleged murder had been committed, a change of venue had been awarded them.

Under these conditions we think the court would only have exercised a wise and judicial discretion to have allowed the plea of " not guilty " to have been withdrawn, and the plea in abatement filed.

*Sixth.* The court erred in not granting defendants' motion to quash the venire.

The grounds of said motion were as follows:

2d. Because the County Commissioners in the selection of the list of three hundred names at their regular meeting in January, A. D. 1881, from which the grand and petit jurors to serve at the Circuit Court of said county during the present year were to be drawn, discriminated against colored men on account of their race, color and previous condition of servitude, and because it has been the custom for the past four years to thus discriminate.

We contend that the motion to quash should have been granted upon the same grounds already alleged in support of the petition to file the last mentioned plea in abatement. The same discrimination against colored persons existed in Hamilton county as in Madison, and we refer to the case of Neal vs. Delaware.

*Ninth.* The court erred in allowing the prosecution ten peremptory challenges, or five peremptory challenges to each prisoner.

Our statute reads as follows : " In capital cases the prisoner shall have twenty peremptory challenges, and the State five." Under this section the court allowed each of the defendants twenty peremptory challenges, total forty, and the State five for each prisoner, total ten challenges. Where there are joint defendants, when the trial is joint, each defendant is entitled to his full number of challenges at common law. Wharton's Criminal Practice and Pleading, 8th Edition, par. 614 ; 2 Hale, P. C., 268 ; 1 Chitty, C. L., 535 U. S. vs. Merchant, 4 Mason, 160 ; 12 Wheaton, 480 ; State

vs. Stoughton, 51 Vermont, 362; State vs. Sutton, 10 Rhode Island, 159 ; Cruce vs. State, 59 Ga., 83 ; Bishop's Criminal Pro., Vol. 1, Sec. 1028; Proffatt on Jury Trials, par. 164.

Peremptory challenges were not allowed the prosecution at common law. Wharton's Criminal Practice and Pleading, 8th Edition, par 612.

(We are aware that some writers differ with Mr. Wharton.) Proffatt on Jury Trials, par. 159.

Persons jointly indicted at common law were not entitled as a matter of right to a severance. Bishop's Criminal Procedure, Vol. 1, 1018 ; Wharton's Criminal Pleading and Practice, par. 309.

This right was reserved for the prosecution. *Ibid.*

That the court erred in allowing the State five peremptory challenges for each defendant would be evident, even if there were no decision to sustain our assignment of error. At common law the State had no right to peremptory challenges ; the defendant also had no right to a severance, but had the right to peremptory challenges, and on joint trial each defendant was entitled to his full number. "Penal statutes are to be strictly construed." And when the statute says that in capital cases the State shall have five peremptory challenges, this is all the State is entitled to even upon a joint trial.

The State could not challenge any peremptorily at common law, but by our statute in capital cases the State can challenge five. If the State desired ten in this case, she had but to exercise her common law right of severance, which was denied to the accused. While the decisions upon this subject are not numerous, yet they are full and satisfactory.

Mr. Proffatt says upon this subject as follows : " But no matter how many are tried on the same indictment, the prosecuting officer is only entitled to his challenges for one,

and cannot claim them for all." Proffatt on Jury Trials, par. 164.

In the case of Frederick Schœffer, Plaintiff in Error, vs. State of Wisconsin, 3d Wisconsin, page 838, the court decides as follows: "Upon the trial of indictment for a capital offence, where there are more than one defendant, each defendant is entitled to challenge twenty-four persons peremptorily.

"One or all may be found guilty, and each one must be regarded as defending himself. Not so in regard to the prosecution. The State is prosecuting for one crime, and though several may be guilty of it, all may be included in the same indictment, and thus make one prosecution, or each may be indicted separately. If, therefore, the prosecuting officer desires to secure to himself six peremptory challenges for each defendant, he should prosecute each separately. But while he cannot control the right of any defendant whom he may choose to join in the indictment, by adopting a joint prosecution against several, he thereby makes the State a party, one and indivisible, upon the one hand, and each of the defendants a party on the other. The right to peremptory challenges is purely a creature of the statute, and it cannot be extended beyond its obvious purview.

"We are, therefore, of the opinion that the court below erred in allowing the prosecuting officer to challenge peremptorily the juror Fairfield, he having already been allowed six such challenges. If the statute should be so construed as to allow the prosecuting officer six challenges for each defendant, he could multiply such challenges indefinitely by simply increasing the number of defendants. Such a construction ought not to be allowed, as it might defeat the very object and intent of the statute."

"The statute of Ohio relating to jurors, which gives to

the prosecuting attorney on the trial of an indictment a right to two peremptory challenges, gives only two in the same indictment, however many defendants may be joined in the same indictment." Mahan vs. State, 10 Ohio, 233.

"When two or more persons are indicted and tried jointly, the State is entitled to no more peremptory challenges than when the trial is against one alone." State vs. Earle, 24 La. Ann., 38.

In this case the prisoners were each allowed to challenge twelve jurors, and the State was allowed six for each accused.

Howe, J., gives the opinion of the court as follows:

"It is true that each defendant was entitled to twelve peremptory challenges, but it by no means follows that the State is entitled to six for each defendant. The State has no rights in the matter beyond those conferred by the statute, and the statute declares that in all criminal prosecutions, wherein the defendant is allowed peremptory challenges, the State shall also be allowed to challenge without cause any number not exceeding six. (R. S., 1870, §998.) This means clearly six in a *single prosecution—in the trial of a single indictment—without any reference to the number of defendants included in the prosecution, or mentioned in the indictment. The language is plain, the case at bar is within its provisions, and we are therefore constrained to think the court erred in allowing the number of peremptory challenges by the State to exceed six.*" * * *

" We are constrained to order a new trial."

In the case of Wiggins vs. The State, 1 Lea, Tenn., page 738, we find the following: " In the trial of a criminal prosecution in which the peremptory challenges of jurors by the State is limited to four, it is error to allow the State to exceed that number, although two defendants are being tried under the same indictment, when the juror thus chal-

lenged by the State was accepted by the defendants, and defendants afterwards exhausted their challenges before the jury was obtained."

This case is stated as follows on page 739: "In making up the jury for the trial of the defendants, after the State, through the Attorney-General, had challenged four jurors, another juror being presented was challenged by the State and accepted by the accused; but the court, being of opinion that when two defendants were on trial under a joint indictment the State was entitled to double challenges, overruled the motion of the defendants that the juror should take his seat for the trial of the cause, and afterwards, the defendants having exhausted their challenges, the jury were elected."

By the act of 1875, chapter 75, in the trial of criminal prosecutions of this character the State is entitled to four peremptory challenges. Under the act of 1829, chapter 55, which provided that " in the trial of all indictments," &c.. " the State and the defendant shall each be entitled to challenge peremptorily five jurors," it was held that where two defendants were arraigned each had the right to the full number of challenges. (Hill vs. State, 2 Yer., 246.) The rule thus established has been followed ever since. But the court refused to extend the rule to civil cases. (Blackburn vs. Hays, 4 Col., 227.) It is argued that the State should have the benefit of the construction. But the reason of the rule is that the right is given to the defendants, and where there are several defendants, although they may be tried together, yet the judgments may be different. Each defendant is on trial, and must stand or fall, ordinarily, as if tried alone. It is only a natural and reasonable construction of the statute to hold that every defendant should have the benefit of its provisions. The State, however, is not multiplied with the defendants, and having elected to

indict and try the parties together cannot claim beyond the fair meaning of the language used. Nor has the construction contended for ever prevailed in practice. The court erred, therefore, in its ruling. 54 Missouri, 153 ; State of Missouri vs. Auton Holme, pages 156 to 160, inclusive.

We have, we believe, thus cited all the cases reported in the United States upon this subject. In each of the four cases referred to it was held that where two or more persons are indicted and tried jointly the State was entitled to no more peremptory challenges than when the trial is against one alone.

*Tenth.* The court erred in allowing the State-Attorney to challenge for cause William Hedding, M. B. Bush, E. O. Horn, upon the ground that said jurors were by-standers and could not be summoned under the order of Friday, June 17th, which called for a special venire of one hundred, to be taken from the county at large excluding by-standers.

The said Hedding testified upon his *voir dire* that he had been present at the trial on Monday and Friday, but did not recollect whether he had been present on Wednesday or Thursday. The said Bush testified that he had been present one day, but not Friday, the 17th. The said Horn testified also that he had been present one day, but not on Friday, the 17th.

The word *by-stander* can only apply to those who were present when the order for special venire was issued. There is no evidence that either Hedding, Bush or Horn were present when said order was made, or how long either of them remained in the court-room when present. There is nothing to show that they had gone there for the purpose of listening to the trial, or had heard any of the evidence. Bush and Horn were present but once, and that was not on Friday. Under the order of the court allowing these three

peremptory challenges any and all persons who had ever entered the court-room during the trial could have been similarly challenged for cause.

We are unable to find any precedent which recognizes challenges for cause upon the rulings allowed by said Judge.

*Thirteenth.* The court erred in not allowing jurors Jones, Knight, McCullens and Lee to answer the interrogatories propounded to them by counsel for accused: " If you should be chosen upon the jury do you not believe that a verdict of acquittal in this case, notwithstanding the evidence might warrant it, would create prejudice against you among your friends and neighbors ?" Also in not allowing the following interrogatory, propounded to juror William Knight by counsel for accused: " From what you have heard of the state of the public mind, do you not believe that a verdict of acquittal in this case would create great prejudice against you if you should be chosen on this jury ?" Also in not allowing juror John M. McCullens to answer the following interrogatory, propounded to him by counsel for accused : " If you should be chosen on this jury is not the state of the public mind, in your opinion, such in your community that a verdict of acquittal, notwithstanding the evidence may warrant it, would create a prejudice and social ostracism against you among your friends and acquaintances ?" Also in not allowing said juror to answer the following question, propounded to him by counsel for accused : " Have you formed any impression unfavorable to the defendants ?"

The accused, we claim, were entitled to answers to all of the above interrogatories—they were all presented and directed for the purpose of ascertaining the true " inwardness " of the jurors towards the accused.

These interrogatories in themselves indirectly indicated

incompetency of the jurors. In such cases the burden of establishing such incompetency rests with the party asserting it. The defendants, therefore, should have been allowed to have pressed the line of interrogatories above referred to for the object thus indicated. The People vs. George Brotherston and Louis Brotherston, 47 California, 388 ; Proffatt on Jury Trials, Par. 176.

" When a person is called as a juror he will be examined on his *voir dire*, and asked ' whether he is twenty-one years of age ? Whether he has the requisite property qualifications ? Whether he is interested in the results of the suit, or is kin to either of the parties ? And whether he is a citizen ?' And, indeed, all questions that are pertinent, the answer to which will not tend to degrade the juror or to be to his dishonor or discredit. In prosecutions for felony he may be further interrogated as to whether he has made up and expressed an opinion as to the guilt or innocence of the accused." State vs. Madoil, 12 Fla., p. 152.

" It is the duty of the court, under the laws of this State, to hear any competent evidence in support of a valid objection to the competency of the juror." Barbour vs. State, 13 Fla., 675 ; Secs. 24 and 5, Chap. 1628, Laws of Fla., Act of Aug. 6, 1868 ; Ingersoll vs. Wilson, 2 W. Va., p. 59 ; Proffatt on Jury Trials, §46.

*Fourteenth.* The court erred in allowing the State Attorney to challenge for cause Jesse Thomas, the said juror having stated upon his *voir dire* that he was opposed to capital punishment, and was asked by accused, " Do you believe, if you should be chosen upon the jury, you could give a verdict according to the evidence ?"

The statute of this State upon this subject is as follows : " No person whose opinions are such as to preclude him from finding any defendant guilty of an offence punishable with death shall be allowed to serve as a juror on the trial of such offence."

The question asked the said Jesse Thomas by the accused was for the very purpose of ascertaining if his opinions were such as to preclude him from being a competent juror.

The fact that he was opposed to capital punishment proves nothing.

In the case of Commonwealth vs. John W. Webster, 5. Cushing, page 295, the court held: "One who is opposed to capital punishment, and fears that his opinion may influence others of the jury, is, notwithstanding, competent to serve as a juror if he believes he can give an unbiased verdict."

Had the juror stated he had conscientious scruples against the death penalty, he would not have been competent. O'Brien vs. People, 48 Barb., 274 ; 36 New York, 277. .

But that a juror is "opposed to capital punishment on principle" does not imply that he had a conscientious opinion which would preclude him from finding a prisoner guilty in a capital case. People vs. Stewart, 7 Col., 140.

We hold, therefore, that the eighth ground of error is well taken.

In regard to the 19th error of Attorney-General's brief, we say we had to obtain this evidence from our own witnesses ; had the question been allowed defendants might have possibly omitted all testimony. -

In regard to the 20th error of Attorney-General's, we cite 9 Bush, Ky., page 11 ; Leiber vs. Commonwealth, 12 Bush, Ky., 271, Collins vs. Commonwealth.

*The Attorney-General* for The State.

The Plaintiffs in Error were indicted for the murder of Frank P. Paterson, the former as principal in the first degree and the other as principal in the second degree. The indictment was found in Madison county, at the Spring term of the Circuit Court for the year 1881. The case was

removed on application of the Plaintiffs in Error to Hamilton county, where they were convicted of murder in the first degree at a special term of the Circuit Court held in June.

The first error assigned is that the court erred in not allowing the accused to withdraw their plea of not guilty and file a plea in abatement on account of errors in the indictment.

The error complained of is the absence from the face of the indictment of the words showing a compliance with the Second Section of Article 6 of the State Constitution. The language of this article is as follows : " The style of all process shall be the ʻ State of Florida,ʼ and all prosecutions shall be conducted in the name and by the authority of the same."

The indictment commences as follows : " In the name of the State of Florida," and throughout the whole case, at every stage, the State of Florida is stated and docketed, and appears as the prosecutor or plaintiff. The indictment purports on its face to be a presentment of the grand jury, and it concludes " against the peace and dignity of the State of Florida," and is signed by John F. White, State-Attorney of the Third Judicial Circuit of the State of Florida, prosecuting for said State, and is endorsed by the foreman of the grand jury to be a true bill. ·The defect claimed is the absence from the indictment of the language, or tantamount language, showing that the prosecution is *conducted by the authority of the State of Florida.*

In the case of State of Florida vs. Gleason, 12 Fla., 247, this section came before the court and Mr. Justice Westcott, delivering the opinion of the court, said : " During the dependence of the American Colonies indictments were *conducted* in the name of the King. Our first State Constitutions, after throwing off the Royal Government, provided

that prosecutions should be carried on '*in the name and by the authority of the Commonwealth.*' It should *sufficiently* appear from the record that this is *conducted* by the *authority* of the *State of Florida*, and not by the *authority of any other power. This is what the Constitution means."*

It is stated in the above case that a prosecution in the name and in behalf of the people of the State of Florida is a substantial compliance with such constitutional requirement.

In *ex-parte* Nightingale, 12 Fla., 272, where the power to prosecute was assumed by the Board of Pilot Commissioners of the port of Pensacola, and was expressly in their name, the court say, "to recognize it as constitutional would be tantamount to constituting an *imperium in imperio*, and to vest in such board a power which the people by the Constitution have expressly confided alone to the 'State of Florida;'" and they also say: "This clause * * * was inserted to exclude the idea that any other, either local authority or foreign power, should exercise this authority of prosecuting for crimes under State laws. It was to assert the sovereignty and supremacy of the State in matters of this kind."

There is no inconsistency in the two decisions. They teach, taken together, that all prosecutions should be in the name of the State of Florida, as this is, and that they should, as a matter of fact, be conducted by the authority of the State and not by other authority, and that it is sufficient if it appear from the record that it is so conducted, although, *strictly* speaking, the language of the section should be used.

In Allen vs. Commonwealth, 2 Bibb, 210, the Supreme Court of Kentucky, where a similar constitutional provision obtained, held that an indictment need not express that it is found by authority of the Commonwealth. The

indictment, as here, was in the name of the Commonwealth, and concluded against its peace and dignity, but did not express to be found by the authority of the Commonwealth. " Such an expression," says the court, " is wholly unnecessary."

The Supreme Court of Mississippi, with a similar constitutional provision before it, held that " a formal statement in the indictment that it was found by the authority of the State is not necessary, if it appear from the record that the prosecution was in the name of the State." Greeson vs. State, 5 How., 33 ; State vs. Johnson, Walker's Reports, 395.

In Wisconsin and South Carolina the same doctrine is held. State vs. Delue, 1 Chand., 166 ; State vs. Anthony, 1 McCord, 285 ; 1 Bp. Cr. Pro., §650.

The second assignment is the overruling of motion of the defendants for leave to withdraw the plea of not guilty and to file a plea in abatement.

There is nothing in the petition which would have constituted a good plea in abatement. No damage or wrong is shown to defendants; no actual denial of equal protection of the laws; no charge is made that there was any incompetent, illegal, prejudiced or unfair grand juror, or any person of any such characteristic, on the list of 300 ; nor that any element of illegality or prejudice, or improper spirit, entered into the action of the grand jury in finding the indictment.

It is, however, to be argued that there is a denial of equal protection of the laws under the 14th Amendment to the United States Constitution. There is in the petition no allegation of such denial. . There are, it is true, statements to the effect that out of 800 colored registered voters, of juror qualifications, in a county where colored voters exceed white voters by 500, only 38 colored voters were chosen

on the list of 300, and that the exclusion of colored voters was on account of their color and former condition of servitude, and a charge that the defendants have been denied the equal civil rights and privileges of citizens of the United States, guaranteed to them by the United States and State Constitutions, in not putting more, or at least upwards of 150, colored persons on the list.

If the fact that there was or was not any colored persons on the list is to have any weight in settling the question as to whether colored persons were excluded from the list *on account of color*, the petition is an answer unto itself.   It is a potential fact.   It shows that the County Commissioners were above so excluding colored persons.   The exclusion to be unlawful must be solely on account of color.   Had the purpose of the Commissioners been to exclude on this account, then there would have been no colored persons selected.   No person is anywhere guaranteed the right to have one or more colored persons on the list, or on his jury; it is merely a right against having colored persons excluded therefrom on account of their color.   In the case of Virginia vs. Rives, 10 Otto, 322, the court says : " Nor did the refusal of the court and of the counsel for the prosecution to allow a modification of the venire, by which one-third of the jury, or a portion of it, should be composed of persons of petitioner's own race, amount to any denial of a right secured to them by any law providing for the equal civil rights of citizens of the United States.   The privilege for which they moved * * * was not a right given or secured to them, or to any person, by the law of the State, or by any act of Congress, or by the 14th Amendment to the Constitution.   It is a right to which every colored man is entitled, that in the selection of jurors to pass upon his life there should be no exclusion of his race, and no discrimination against them, because of their color ; but this is a different

thing from the right which, it is asserted, was denied to the petitioners by the State court, viz : a right to have the jury composed in part of colored men. A mixed jury in a particular case is not essential to the equal protection of the laws, and the right to it is not given by any law of Virginia [nor Florida], or by any Federal statute. It is not, therefore, guaranteed by the 14th Amendment."

In view of this language and the doctrine of the opinion from which it is taken, the pretensions of the petition and motion to a right to have more colored persons are untenable. They have no right to have colored persons, but they still have them on the list. They have a right against exclusion solely on account of color, but still they have colored persons on the list. It would be a very impracticable job to fix the exact stated relative number of white and colored persons that should be selected in the existing absence of a statute settling it. What minds would agree as to the numbers? Where is the law to be found prescribing what numbers would answer, or who shall prescribe the numbers? No where. The liberality of being content with the half and a small excess, as may be the case with defendants, might in others be surpassed by a demand that nearly all of the 300 should be colored persons.

Laying out of view everything else but the petition, the weight of its evidence is that colored persons were not excluded from the jury on account of color. It presented at least not only a conclusive case that the jury list was not one from which the race was excluded on account of their color, but a *prima facie* case that no colored man had been excluded from it on account of his color. It is very different from the case of Neal vs. Delaware, 13 Otto, 370, where it appears that no colored person had ever been summoned as a juror in that State. This case will be more fully discussed hereafter.

The court seems to have considered the motion of the State to strike out the petition of defendants with the latter's motion. The State's motion contained a formal denial of the averments of the petition, and was supported by Mr. Pope's affidavit. In view of this issue, and the statements of the affidavit, and the character of the petition as shown above, certainly this court cannot conclude that the charge was true, or that the court below erred.

Admitting there is anything of merit in the proposed plea, it comes too late, and without any sufficient showing for the omission to plead it before pleading not guilty. The court had been in session 8 or 9 days, so counsel must have had twelve or fourteen days before the plea of not guilty, and no reason is shown why in this time, by the use of diligence even less than ordinary, they could not have conceived the sort of an idea here presented, nor discovered any ground for it. In cases growing out of or surrounded by political excitement such ideas are always quick and *too common.*

The withdrawing of a plea of not guilty and permitting a plea in abatement is within the sound discretion of the court. The general rule is that pleading the plea of " not guilty " alone waives all matters of abatement. Unless there was an evident abuse of such discretion, the refusal of the lower court will not be reversed above. 1 Chitty Cr. L., m. p. 447 ; 1 Bp. Cr. Pro., §§756, 123-4, 747 ; 12 Rich., 24 ; 12 Allen, 4 ; 2 McCord, 257.

The sixth assignment is that there was error in not granting defendants' motion to quash the regular venire for the petit jury.

Assuming that the objection to be urged under the first ground is that the clerk should have drawn the venire in the presence of the other two officers, and that the drawing is illegal, in that it shows that the three officers drew it, it

is respectfully insisted by the State that the record cannot be taken as asserting that the clerk did not do the actual drawing. In the absence of a showing to the contrary officers are presumed to do their duty, and this record, construed in the light of the law prescribing their duties in the premises, should, even apart from the clerk's certificate, be construed as asserting that the three officers joined in effecting the drawing, and that each one performed his appropriate part. It does not state who actually drew the *names from the box*, and to assume that any one other than the clerk did it is more than the record shows, and contrary to the rule of law above stated as to presumptions where official action is involved. Ammons vs. State, 9 Fla., 538; United States vs. Crussel, 14 Wall., 1; Best on Evidence, 300, cited in 2 Otto, 284; Cowen and Hill's Notes to Phillips on Evidence, note 10, pp. 296–7, and note 13, p. 304; Rudds vs. Johnson, 5 Littell, 19; Lincoln vs. Taunton, 11 Cush., 440; Wallace vs. Maxwell, 1 J. J. Marshall, 447.

The certificate of the clerk shows clearly that the clerk actually drew the names from the box in the presence of the other officers, as required by law. There is nothing in the law requiring a certificate or record to be made of the drawing, and hence it could be proved by parol how it was done. Bank vs. Dandridge, 12 Wheaton, m. p. 69–70, 82, et esq.

There is no proof of the second or "color and previous condition" grounds set up by defendants. The affidavit is on "reliable information," and is traversed and contains not a word of positive assertion; nor are the sources of their "reliable information" stated. It does not even specifically state that the 200 colored men are registered voters. Were there no traverse to the charge, the affidavit would still be insufficient evidence of the charge it makes, for reasons inherent in it besides those urged as to the petition on

the motion to withdraw the plea of not guilty and plead in abatement. It does not state that there are no colored men on the venire, but shows that there are some on the list. Courts should not, and do not at this late day, upset venires and assume violations of law, constitutions and morality, because an affidavit on " reliable information " is made stigmatizing officers.

Where, in this affidavit or record, is to be found the proof that a single man was excluded from the list of 300 solely because of his color, or that any one excluded was qualified to be a juror? To sustain the charge made, (in the face of the showing in this affidavit that the race was not excluded,) the court will require clear and positive proof that there was an exclusion solely on the ground of such previous condition, and that putting the few on was a mere fraud and pretence.

In the case of Virginia vs. Rives, (100 U. S. Reports) Mr. Justice Strong says: " The assertions in the petition for removal, that the grand jury by which the petitioners were indicted, as well as the jury summoned to try them, were composed wholly of the white race, [which the list in question is not,] and that their race had never been allowed to serve as jurors in the county of Patrick in any case in which a colored man was interested, fall short of showing that any civil right was denied, or that there had been any discrimination against the defendants because of their *color or race*. The facts may have been as stated, and yet the jury which indicted them, and the panel summoned to try them, may have been impartially selected."

There is not even a statement that they cannot get justice from the venire in question, or that they will suffer from the absence of colored persons therefrom.

There was no error in the court's permitting the papers filed by the State to stand as raising an issue on the alle-

gation made by the motion.    An issue of law or fact has to be reached in every case before there can be a trial.

The court will observe the marked distinction between this case and that of Neal vs. Delaware in the matter of an issue and the necessity in this case for proof of the allegation of exclusion and discrimination.    In that case there was not even a formal denial of the grounds alleged by Neal, nor any objection to the use of the affidavit ; but on the contrary an agreement that the verified petition for transfer should be treated as an affidavit in the consideration and decision of the motion, which the United States Supreme Court took as implying a willingness on the part of the State to risk a determination upon the case as made by the affidavit, with any facts of which the court below would take judicial notice, including the fact that no colored citizen had ever been summoned as a juror in the courts of Delaware.

The seventeenth and eighteenth assignments are in substance, the court's permitting the State to challenge peremptorily Henry Mitchell, James Cunningham, Frank Zipperer and Peter Morgan, after it had so challenged five other jurors.

Our statute provides that " in capital cases the prisoner shall have twenty peremptory challenges and the State five."

The prisoners each claimed twenty for himself, the State claimed five against each, and the Judge ruled that they should be so allowed.

In the case of Wiggins vs. State, 1 B. J. Lea, (Tennessee) Reports, cited by the plaintiffs in error, it was held " in the trial of a criminal prosecution, in which the peremptory challenge of jurors by the State is limited to four, it is error to allow the State to exceed that number, although two defendants are being tried under the same indictment,

where the juror thus challenged by the State was *accepted by the defendants*, and the defendants afterwards *exhausted their challenge before the jury was obtained*." The defendants in that case moved that the juror should take his seat for the trial of the cause.

In Mahan, *et als.*, vs. State, 10 Ohio, 232, m. p., cited by plaintiffs in error, the statute provided that every prosecuting attorney and every defendant on the trial of an indictment may challenge peremptorily two of the panel; and if any person prosecuting in behalf of the State shall challenge any petit juror, except as aforesaid, he shall immediately assign the cause of such challenge. The facts are, that each of the three defendants had exercised such right by a peremptory challenge of two; the prosecuting attorney then claimed the right to challenge six, and it was allowed. It was held to be error.

In the case of Schœffler vs. The State, 3 Wisconsin, 823, cited by plaintiffs in error, the statute provided that the prosecuting attorney in capital cases should be allowed " to challenge peremptorily six of the persons returned as jurors, and no more." The prosecuting attorney was allowed six against each defendant, and the court held it to be error. The court say : " We do not know, of course, why the prosecution challenged the juror. It is sufficient to know that he was to all appearance competent, and that he was acceptable to the defendants, and that the challenge of the prosecuting officer was unauthorized by law."

In the case of State vs. Earle & Garvey, 24 La. Ann., 38, cited by the plaintiffs in error, the statute provided that " in all criminal prosecutions, wherein the defendant is allowed challenges, the State shall be allowed to challenge without cause any number not exceeding six." It merely appears that the State was allowed twelve, and it was held error.

There has been no decision by the Supreme Court of Florida, so here it is an open question, both in the abstract and in connection with the particular facts of this case.

. By the common law, the prosecution in criminal cases could exercise, on behalf of the crown, peremptory challenges to an unlimited extent without alleging any other reason than that " they are not good men for the King." Proffatt on Jury Trial, §159 ; 1 Chitty Cr. Laws, 533.

The statute is one, then, in derogation of the common law right.

The right of using against each defendant the statutory number of challenges can be secured by a severance or by indicting separately. This is not denied by any authority. What, then, is the injury to any prisoner if it should be allowed without a severance ? It is not questioned that each defendant, where there is no severance, has for himself the statutory number.

Whatever may be the abstract rule to be adopted by this court, under the circumstances of the case at bar, the ruling of the court below should not be made the basis of a new trial.

. The ruling has done the prisoners no harm ; they have been tried by an unexceptionable, and, except as to one juror, an unexcepted-to jury. If the case goes back, they can neither claim nor get anything better in the shape of jurors. The law neither guarantees nor conceives anything more for them. What, then, do they complain of—that an improper man has been put on the jury ? No. That certain men are not on it ? No, for we do not know whether they desired to take or would have taken them, or either of them ; but merely because defendants were not given an opportunity, in case the State had no grounds of challenge for cause, to select, or reject them peremptorily, if they themselves should not present grounds of challenge for

cause. It does not appear that any man of less merit or fairness than Messrs. Zipperer, Cunningham, Mitchell and Morgan sat on the jury. Is it not, then, a mere abstract question in this case, in so far as any practical effect the ruling has had upon the defendants' rights? Moreover, there is nothing in the record to show that the defendants had either exhausted or made use of their peremptory challenges.

Where justice has been done in a case, why should a new trial be granted on account of such an error? Is not as much accomplished as could be in the absence of such an error?

When a cause has been tried by an impartial jury, although the Judge, on the application of the plaintiff and against the consent of the defendant, may have rejected a juror for a cause, somewhat questionable as to its sufficiency, such rejection is not matter available in error. Tatum vs. Young, 1 Porter, 298.

The court, in the exercise of a sound discretion, has a right to excuse a juror, although he may be found competent to serve; and such an exercise of discretion is no error, although objected to by the parties to the action. John D. C. vs. *ex rel.* Julia V. H., 16 Fla., 555.

It is no ground for the reversal of a judgment of conviction of murder that, in empanelling the petit jury, the court required the State and defendants to challenge peremptorily at the same time, by striking from a list of 36 jurors the objectionable names, instead of conforming to the usual and better practice of allowing the right to be exercised as each juror was called; the record not showing the defendant was prejudiced. State vs. Hays, 23 Mo., 287.

When a verdict of a jury accords with the law and facts of the case, a judgment will not be reversed on account of

an erroneous charge to the jury, or a refusal to give instructions which may be appropriate, especially when a correct charge should produce the same result upon the facts. May's Ex'rs vs. Seymour, 17 Fla., 725; Brown vs. State, 18 Fla.; Prescott vs. Johnson, 8 Fla., 391; Doggett vs. Wiley, 6 Fla., 482; Wilson vs. People, 94 Ill., 299; Leach vs. People, 53 Ill., 318; Calhoun vs. Oneal, 53 Ill., 357.

The matter of excusing jurors, and of when challenges shall be made, and many other matters in the trial of a cause, rest in the sound discretion of the lower court, and its action will not be disturbed unless it is shown that injury has been done to the prisoners. State vs. Hays, 23 Mo., 287; State vs. Marshall, 8 Fla., 91; State vs. Ostrander, 18 Iowa, 435; State vs. Madoil, 12 Fla., 163–4.

If no harm has resulted to the prisoners there can be no more reason why a new trial should be granted on account of error as to a peremptory challenge, than in one for cause or a charge to the jury.

The tenth error assigned is the court's allowing the State Attorney to challenge for cause William Hedding, M. B. Bush and E. C. Horn. The order for the venire was that they should be summoned from the body of the county at large. These men had been, on the day of the order or other days, about the court-house. The Judge permitted them to be challenged on the ground that they were bystanders. It was evidently the purpose of the Judge to prevent any one who might have come to the court-house with the view of getting on the jury from accomplishing such purpose. This was clearly his intention, and it was the exercise of a sound and commendable discretion, and, in permitting the challenge, he was merely enforcing the spirit and purpose of his order, and no harm has resulted to any one from it. John D. C. vs. Julia V. H., 16 Fla., 561–2; State vs. Marshall, 8 Ala., 302; Tatum vs. Young, 1 Porter, 298; State vs. Ostrander, 18 Iowa, 435.

The thirteenth error: The question put to Jones was improper, and so far as the books treat, almost, if not entirely, unheard of. It is not a question as to any prejudice or bias or incompetency of his, but as to consequences which might follow him in case he should find the testimony to make it his duty to acquit. It does not even present the query, whether he would be equal to his duty in the premises. We have been unable to find any law justifying any such question. The same may be said of the first question to McCullens, and of that to Knight. The one to Knight is rendered more untenable by the previous answer he had made. The second question to McCullens was improper, and had been fully and satisfactorily answered.

Of these three jurors, however, Knight alone was selected and served. He shows he was perfectly qualified. How the others were disposed of, whether by peremptory challenge of defendants or State, or how, the record does not disclose. If it was by a peremptory challenge by defendants or by State, I do not see what harm is done. There is nothing in the record to show that defendants ever exhausted their peremptory challenges, or could not have got rid of Knight if they desired. The jury was fair and legal and unobjectionable. Knight was the only man on it ever specially objected to. There was no error, and no injury to defendants. Montague vs. State, 17 Fla., 664; 1 Am. Cr. Law, §3031; John D. C. vs. Julia V. H., 16 Fla., 561, et seq.; Tatum vs. Young, 1 Porter, 298; Burt vs. Panjaud, 99 U. S., 180.

The fourteenth error assigned is, permitting the State to challenge for cause Jesse Thomas, who was called as a juror. Thomas stated on his *voir dire* that he was opposed to capital punishment, and was afterwards asked by counsel for defendants: "Notwithstanding your opposition to capital punishment, do you believe, if you should be sworn

upon this jury, you could give a verdict according to the evidence?" The question was objected to, and objection sustained. Whether or not his answer to the question would have been affirmative had it been permitted to be asked, as he had opposition to capital punishment, the act of permitting him to be challenged for cause, which was the result, was certainly in the exercise of a sound discretion. It was certainly best and the most just for all concerned, and no harm could result from ruling even upon the assumption of an affirmative reply. 16 Fla., 561, et seq.; 1 Porter, 298; 99 U. S., 180.

The nineteenth error assigned is the refusal of the court to permit the counsel for the accused to ask the witness Church: " Immediately after the difficulty did you notice any marks of violence about or on the person of Savage ? If so, state the locality and character thereof." The refusal was based on the ground that the question was not in cross of anything brought out by the State on this examination. If error it is immaterial, as the facts desired were brought out by the evidence of Eagan and Hankins.

The twentieth error assigned is as follows: Coyle, a witness, in reciting the dying declaration of Paterson, says: " Paterson stated other facts and circumstances concerning the killing that happened at the killing. I asked Paterson if he shot either of the parties, Savage or James, and he said he did not. I asked Mr. Paterson if he had a fight with Savage and James." Here counsel for accused objected to his giving Paterson's answer. " He said no ; that Savage grabbed him and shot him. The conversation stopped." Other testimony shows clearly that Paterson was dying, and believed himself to be without hope of recovery. The answer relates to the circumstances of the death or killing, and is admissible. Dixon vs. State, 13 Fla., 638–40 ; Green vs. State, 13 o., 382.

As to the twenty-third assignment I respectfully submit that prejudice or ill feeling among their political opponents, engendered as indicated by the first question, cannot be invoked to justify or excuse or mitigate the homicide in question ; nor can ill feeling among certain political opponents, caused by their conduct as indicated in the second question ; nor threats on account of said conduct; nor both. The questions do not, besides, connect the deceased with such threats. For the same reason the third question, considered as a whole, was improper. It was allowed as a question in so far as it applied to the deceased, and no more could be properly claimed.

THE CHIEF-JUSTICE delivered the opinion of the court.

I. The *first* and *third* of the errors assigned which are urged here are that the court erred in overruling defendants' application for leave to withdraw their plea of not guilty and to file a plea in abatement to the jurisdiction and in overruling the plea. The ground of the plea in abatement is that the court is without jurisdiction because what purports to be an indictment is not such as is required by the Constitution, in that it is there required that " all prosecutions shall be conducted in the name and by the authority of the State of Florida," and this indictment does not purport in words to be " by the authority " of the State.

The indictment commences thus : " In the name of the State of Florida ; the grand jurors, good and lawful men of Madison county, State of Florida, duly chosen, empanelled and sworn to diligently inquire and true presentment make in and for the body of the county of Madison in the Circuit and State aforesaid * * upon their oaths do present," &c. It is signed "John F. White, State's Attorney

for the Third Judicial Circuit of the State of Florida, prosecuting attorney for said State." ·

Thus it appears that the indictment is presented by the grand jurors of Madison county, State of Florida, chosen to inquire for the body of said county in the said Circuit and State, and they have presented the defendants and charged them with the crime of murder, in due form. They make the presentment in the name of the State. The Constitution says all prosecutions shall be *conducted* in the name and by the authority of the State. It is not required that the indictment on its face shall say in words that it is "prosecuted in the name and by the authority" of the State. It merely directs that the State in its name and by its authority shall prosecute, and that no other name or any other authority shall control the prosecution. It is sufficient that the court shall recognize the State and its authority, and no other party or authority in such prosecutions, and that the proceedings are so conducted and the record show it. The cases cited by counsel for plaintiffs in error (Harriman vs. The State, 2 G. Green, 270, and Lovel vs. State, 45 Ind., 550–1,) sustain this view. In the case of the State vs. Gleason, 12 Fla., 247, 253, the court did not deem it very material that the information should upon its face express the words of the Constitution, but directed it to be so amended out of caution, the information being deemed the *process* in *quo warranto* proceedings. The indictment in form purports to be a prosecution in the name of the State, and the attorney of the State prosecutes for the State. The court recognized no other authority than that of the State, and this is sufficient. The plea tendered "to the jurisdiction" was therefore properly overruled, and the motion to withdraw the plea of not guilty for the purpose of filing such plea was well refused. In fact the plea proposed was not a plea *to the jurisdiction.*

II. A motion for leave to withdraw the plea of not guilty and to file a plea in abatement of the indictment was made upon petition setting forth that in Madison county, where the indictment was found, the County Commissioners were white men and former slave-holders; that there were in said county eight hundred colored men, registered voters, in all respects qualified to serve as jurors; that the colored voters in said county exceed in number the white voters by five hundred, and yet only thirty-eight colored men were chosen on the list of three hundred persons selected from whom the jurors were to be drawn, and "that *this unjust exclusion* of them from the list of persons from whom the jurors were to be drawn as aforesaid was on account of their color and former condition of servitude, and the grand jury which presented said indictment were drawn from said list," whereby petitioners were practically deprived of rights guaranteed by the Constitution—they being colored men and of the African race and having been slaves.

The petition speaks of " this unjust exclusion " of colored men as being by reason of their color and former condition of servitude; but it does not before appear that there had been any unjust exclusion, nor was a plea in proper form tendered, nor had it been previously tendered before or after the change of venue from Madison to Hamilton county. But the general rule is that a plea in abatement should be put in before pleading in bar. (1 Wharton Cr. Law, 359, n.) By pleading not guilty the accused waives matter in abatement. (McQuillan vs. State, 3 Sm. and Mar., 587; 1 Allen, 4; 1 Bish. Cr. Pro., §§123, 756.) It may have been within the discretion of the court to permit the accused to withdraw the plea of not guilty for the purpose of pleading in abatement, but such discretion should never be reviewed or set aside. In this case the indict-

ment was found in Madison county and the accused were arraigned and pleaded there and then obtained a change of venue. All the witnesses and records to prove the manner of selecting the grand jurors were in that county, and it would have occasioned great delay and expense to try the issue attempted to be set up after the cause had been sent to Hamilton county. It would have been an abuse of discretion to have granted the motion at that stage, especially as the accused had counsel present at the time of pleading in bar. The court therefore did not err in refusing the motion to withdraw the plea and for leave to plead in abatement.

. The *fourth* assignment of error seems to have been alleged under a misapprehension of the ruling of the court. The petition was not stricken out.

The *fifth* error assigned relates to the refusal to remove the cause to the court of the United States. This assignment is not insisted upon.

III. The *sixth* error assigned is the refusal of the court to quash the venire of petit jurors.

The motion to quash was made upon two grounds : 1st. " Because the venire was not drawn according to law ; and, 2d, because the County Commissioners, in the selection of the list of 300 names at their regular meeting in January, 1881, from which the grand and petit jurors to serve at the Circuit Court were drawn, discriminated against colored men on account of their race, color and previous condition of servitude."

The accused filed an affidavit in support of the motion stating on information and belief that there were in the county at least 200 colored men qualified to serve as jurors, and that all of them except six were wilfully excluded from the list by the County Commissioners ; that the whole voting population was about 1,300, and that the discrimi-

nation in refusing to place a larger proportion of colored men on the list of 300 was on account of their race, color and previous condition. The State-Attorney filed an affidavit denying specially, on information, the allegations contained in defendants' affidavit; defendants' attorney moved to strike out the latter affidavit, which motion was granted so far as to refuse to consider it as *evidence*, but retained it so far as to make an issue as to the allegations of the affidavit of the accused.

There was no evidence offered in support of the motion except the affidavit of the accused, which was general in its allegations and stated nothing upon their own knowledge  The facts being put issue or not admitted by the State, it became necessary for the accused to prove their allegations. Not having done so there was no evidence on which the motion to quash the venire could be granted.

The seventh and eighth assignments are not insisted upon.

IV. The *ninth, seventeenth* and *eighteenth* errors assigned are that the court allowed the State-Attorney more than five peremptory challenges.

Four persons called as jurors were challenged peremptorily by the State after it had so challenged five, and the challenges were allowed by the court. The statute allows challenges as follows : " In capital cases the prisoner shall have twenty peremptory challenges and the State five."

Where two are jointly indicted and tried for a capital offence each prisoner is allowed twenty peremptory challenges, but the law does not allow more than five to the State as to both. To allow the State to challenge five for each would in effect give the State ten for each prisoner, because each challenge affects each prisoner alike. Counsel for the Plaintiffs in Error cite several authorities to sustain this position : Proffatt on Jury Trials, §164 ; Schoeffler vs,

State, 3 Wis., 823; Mahan vs. State, 10 Ohio, 232; State vs. Earle, 24 La. An., 38; Wiggins vs. State, 1 B. J. Lea, Tenn., 738.

We have found no other cases directly in point. It is unnecessary to consider this question further. It is clear that the court erred in allowing more than five peremptory challenges to the State, and an exception having been taken to the action of the court there was material error affecting the rights of the defendants.

V. The *tenth* and *eleventh* errors assigned are .that the court allowed the State-Attorney to ask persons summoned on special venire and called as jurors whether they had been present at the court during the preceding days, and in sustaining a challenge by the State for cause, it having been found that they had been present.

It appears that these persons were summoned by virtue of a special venire, issued under the order of the court, directing the sheriff to summon one hundred good and lawful men from *the county at large* to serve as jurors. The persons referred to were challenged by the State-Attorney for cause, they having been present in attendance at the court and were therefore considered as *by-standers*, and not from the *county at large*. The statute provides for the summoning of jurors " from by-standers or from the county at large." It evidently refers to persons who have been in attendance upon the sessions of the court as by-standers and to those who have not been so in attendance as from the county at large.

Very much must in the nature of things be left to the sound discretion of the Judge who presides at the trial in respect to the excusing of jurors. An arbitrary exercise of this discretion without probable cause could not be sustained, and yet the Judge may have abundant reason to exclude persons from a jury in a given case, where the

juror himself would have no ground to ask to be excused, and there may be no valid ground of challenge. In a case like the present there is frequently much excitement or interest felt in the community, and numbers attend at the term of the court out of curiosity, interest, partizanship or excitement, and the particular case is canvassed with more or less of the elements of sympathy or prejudice, or both, leaving impressions and opinions in the minds of listeners. We can well conclude from the character of the order directing the sheriff to summon jurors from the "county at large" instead of "by-standers" that the purpose in excluding those who had been in attendance at this term, which was being held for the trial of this case, was that the Judge and the State-Attorney desired to have upon the jury only men who had not been influenced or impressed by the surroundings, and to exclude those who are sometimes anxious to get upon juries and frequent the courts for that purpose. In other words, it is evident that the prosecuting attorney and the Judge desired to obtain an unprejudiced jury. There was, in this view, cause apparent to the Judge for excluding from the jury persons who were included in the class that he had directed should not be summoned for valid reasons. We will not here say that there was good ground of *challenge* of the persons referred to, but we cannot say that the act of discharging them was arbitrary and without cause. See J. D. C. vs. J. F. H., 16 Fla., 555, and cases cited.

VI. The *twelfth* error assigned is that the court allowed the State-Attorney to withdraw a peremptory challenge and then to challenge for cause, and to interrogate the person as to cause.

We do not find the precise case in the books. Manifestly, however, the matter is somewhat within the discretion of the court, but it should not be permitted unless the person

challenged is present so that he may be examined as to cause, or unless it is discovered that he is a person disqualified by law from being a juror. But to allow a peremptory challenge of a person not so disqualified to be withdrawn after the person had absented himself would, in effect, increase the number of peremptory challenges, and should not, in such case, be allowed. If the challenge for cause is not sustained the peremptory challenge must stand.

VII. The *thirteenth* error assigned is the refusal of the court to permit the counsel for the accused to ask E. P. Jones, called as a juror: "If you should be chosen upon this jury do you not believe that a verdict of acquittal in this case, notwithstanding the evidence might warrant it, would create prejudice against you among your friends and neighbors?" and his refusal to permit such counsel to ask William Knight, who was called as a juror: "From what you have heard of the state of the public mind do you not believe that a verdict of acquittal in this case would create great prejudice against you if you should be chosen on the jury?" Knight had previously answered that he had not formed or expressed an opinion as to the guilt or innocence of the accused; that he had no bias, prejudice or ill-will against the accused, and that he felt perfectly free to give a fair and impartial verdict upon the evidence; and his refusal to allow such counsel to ask John M. McCully, called as a juror: "If you should be chosen on this jury is not the state of the public mind, in your opinion, such in your community that a verdict of acquittal, notwithstanding the evidence may warrant it, would create a prejudice and social ostracism against you among your friends and acquaintances?"

The object to be attained by allowing the examination of persons drawn as jurors is to ascertain their qualifications and whether they would be absolutely impartial in their.

judgment.  From this examination the court may determine whether they should be allowed or not to sit as jurors, and the parties may determine whether they will challenge *either* from cause or peremptorily.  The parties have the right to ascertain the status of the candidate by asking him any pertinent question.  We think the questions here propounded were not properly addressed to the person drawn as a juror.  He might be inquired of as to whether he was conscious of any circumstances which might influence him in giving a verdict other than upon a fair consideration of the evidence in the case.  But there is no known rule authorizing an inquiry the answer to which might tend to degrade him or produce a prejudice against himself, or ostracism against himself and his family.  When a juror takes an oath to try a case and render a verdict according to the evidence given in court, he falsifies his oath if he gives a verdict from other considerations.  This oath is the protection of suitors in respect to the subject of the inquiry.  In a capital case the accused has a large number of challenges to be used at discretion for his protection.

VIII.  The *fourteenth* error assigned is that the court erred in not allowing Jesse Thomas, called as a juror, to answer the question proposed to him by defendants' counsel: "Notwithstanding your opposition to capital punishment do you believe if you should be sworn upon this jury you could give a verdict according to the evidence?"  Thomas had stated on his *voir dire* that he was "opposed to capital punishment."

The statute in capital cases disqualifies "persons (to be jurors) whose opinions are such as to preclude them from finding any defendant guilty of any offence punishable with death."  (Act of 1868, McC.'s Dig., 447, s. 13.)  Thomas had not said his opinions were such as to prevent him from conscientiously finding a verdict of guilty; he

had said only that he was opposed to capital punishment. The question was a proper one, tending to find whether his opposition to capital punishment was such as to disqualify him. He was not disqualified solely by reason of his being opposed to capital punishment, unless such opposition was such as to preclude him from finding a verdict of guilty. We do not find, however, that he was excluded by the court for this reason, and we cannot therefore say that an error was committed prejudicial to the accused. (Burt vs. Panjaud, 99 U. S., 180 ; Metzger vs. State, 18 Fla.) As before remarked, courts have much discretion in determining the qualifications and fitness of persons to be jurors.

IX. The *fifteenth* and *sixteenth* assignments of error are put upon the ground that the court refused to allow certain questions put by counsel for the accused to McCully and Lee, summoned as jurors. The record does not disclose why these persons were excluded from the jury, or upon whose challenge or for what reason. It is not therefore apparent whether any error was committed by the ruling. Burt vs. Panjaud.

X. The *nineteenth* error assigned is the refusal of the court to permit counsel for the accused to ask the State witness (Church) the question : "Immediately after the difficulty did you notice any marks of violence about or on the person of Savage ; if so state the locality and character thereof ?"

This ruling of the court was made upon the ground that the question was not in cross-examination of anything brought out by the State, but was competent testimony for defence through their witnesses.

The witness had testified to seeing the deceased and Savage in the room where they met ; heard scuffling, saw Savage, on looking round, with his arm around Paterson's neck, his hand fastened in Paterson's coat-collar ; went to-

wards them; saw Savage shoot Paterson with a pistol; after that the parties scuffling, Paterson pushing against Savage, trying to get loose; saw Savage fire again, and during the affair both had moved from one part of the room to another, and James finally shooting at Paterson, who fell, and in the course of the affair Savage partly fell, etc. The testimony of the witness Church up to this point covered some ten or more pages of the record.

The objection and the ruling were based upon the fact that the witness had not testified as to seeing marks of violence on the person of Savage, and therefore that it was not in the course of cross-examination to ask the question.

It is a well-established rule in the United States that a cross-examination of witnesses is, at the strictest, confined to " facts and circumstances connected with the matters stated in the direct examination."   14 Pet., 461; 1 Greenl. Ev., §445.

There is another familiar rule that when a witness testifies to certain facts relating to a transaction in his presence he should testify to the whole of it.   Now this witness testified to seeing Paterson and Savage and James and what they did and their position and condition at the time of the affair.   It was certainly in the line of the cross-examination to inquire of this witness if he saw anything else, and what else he saw at the time as to the condition of the parties directly concerned in the matter of which he had testified.   And it was proper cross-examination, not only for the purpose of proving by him any surrounding facts other than those testified to, but for the purpose of testing the correctness of the statements already made, and for these objects the cross-examination is not to be confined to what the witness had already stated.   He may be inquired of as to *all* he saw, and *all the facts* and circumstances connected with the matters already stated, which includes as well the

condition of the parties as their acts. Some of their acts and something as to their condition had been stated, and the defendants were entitled by leading questions or otherwise to draw out anything else the witness had observed at the time as to the condition of either of the parties.

The fact that the matter inquired of was afterwards testified to by other witnesses does not affect this question. The defendants were entitled to inquire on cross-examination as to *all* the witness saw after he had testified to part of it.

XI. Upon the *twentieth* error alleged as to the "dying declarations" of Paterson, nothing need be said except that they are always received as evidence, it being first established that the person making them is conscious of approaching death and has no hope of living and the circumstances of the cause of the death are the subjects of the declarations. We examined the legal question in Dixon vs. The State, 13 Florida, 638, and refer to the rule as there stated. We think the testimony before us as to his dying declarations was proper evidence, as showing the condition of the parties, the encounter, the means of death, the persons engaged and who committed the fatal acts, as though the person making the declarations was a witness before the court. The portions of such declarations to the effect that Paterson had nothing to defend himself with, and that he was "robbed of (his) life" are not parts of the *res gestæ*. and should not be called out if it can be avoided. If these expressions are testified to, the court will, of course, instruct the jury, if another trial is had, that they are not evidence. So far as the declarations related to facts occurring at the time of the encounter, the weapons used and the parties using them, what was said and what was done, they are competent, and the court should as far as possible confine the testimony to these matters as constituting the *res gestæ*.

XII. The *twenty-first* error alleged is that the court permitted the witness Florid to answer questions relating to defendant, James, snapping his pistol at the witness. This circumstance occurred at the time of the difficulty and between the shots said to have been fired by the accused at Paterson. The testimony was not objectionable; it showed that James was there, armed with a pistol and endeavored to use it.

The *twenty-second* ground of error assigned, relating to the ruling of the court upon the question by the State Attorney as to whether witness had seen other guns about Madison like those in the hands of the accused, on the day before the killing, is unimporrant, as this testimony does not appear to be material or pertinent to the case.

As to the *twenty-third* alleged error, referring to the exclusion of testimony to the effect that extreme ill-feeling and prejudice existed among political opponents, cannot be sustained for the same reason. The investigation would be endless and boundless.

The *twenty-fourth* and *twenty-fifth* assignments were not insisted upon.

XIII. The *twenty-sixth* and *twenty-seventh* errors assigned are that the court erred in the charge to the jury. After charging at length relative to the law of homicide, the Judge concluded with the following propositions:

" 2. If you believe from the evidence that Paterson, on passing unarmed, not having arms exposed to view, where Savage was standing, accused Savage of perjury and did nothing more, that Savage using strong language in reply immediately sprang upon Paterson and grasped him to his body, until he, Savage, could draw his pistol from his pocket for the purpose of shooting Paterson, and that he did then and there draw his pistol and intentionally shoot Paterson, killing him, the act was not justifiable on the

ground of self-defence, but is murder in the first degree, and if James was present, aiding and abetting, he was guilty of the same offence as principal in the second degree."

" If you believe from the evidence that Paterson being unarmed on passing Savage unarmed (for the law presumes that they were both unarmed unless they bore them in public view) insulted Savage by using mere words, that Savage retorted by using insulting language, Paterson had no right in law to strike Savage, but if he did with his fist only, Savage had the right to strike back, to repel force by force, and no more, but if he sprang upon Paterson and shot him to death, under the circumstances as stated in the last foregoing proposition, he carried his resistance too far and the act was not justifiable on the ground of lawful self-defence; it may be manslaughter in the second or third degree, according to the means used, and James, if he was present, aiding and abetting Savage, he is guilty of the same offence as principal in the second degree.

" 3. If you believe from the evidence that Paterson had a sudden quarrel with Savage and struck him in the face, under the circumstances referred to, a severe blow, such a one as must have inflamed the passions into a heat, that the passions of Savage were actually thrown into a heat, so that thereby the reason of Savage was for the time overthrown, or his mind so clouded that immediately he drew a weapon, a pistol, and fired on Paterson, without a design to effect his death and killed him, the offence is manslaughter in the second or third degree; in the second degree if it was done in a cruel and unusual manner; in the third degree if done by a dangerous weapon; and James, if he was present aiding and abetting Savage, they are both guilty of the same offence."

" 4. If you believe from the evidence that this blow,

this provocation, was not a severe but a slight blow with the fist, and that a *dangerous weapon* was used by Savage, and Paterson thereby immediately killed, these facts create a strong presumption of malice, a wicked *intention* to do the injury, and rebuts the presumption that it was done *in a heat of passion* and without a *design to effect death.*"

"5. If you believe from the evidence that Paterson, under the circumstances just stated, struck Savage a severe blow calculated ordinarily to inflame his passions into a heat, but that in fact in this case Savage was *not* in a heat of passion, but acted with deliberation on a grudge or from a wicked and depraved heart, and not from the provocation (the blow) it is not manslaughter, but murder in the first degree; and if James was present, aiding and abetting Savage in the act, he is also guilty of murder in the first degree."

"6. If you believe from the evidence that Savage, without any other cause or excuse than insulting words on the part of Paterson to him, grabbed Paterson deliberately and held him until he, Savage, could draw his pistol for the purpose on his (Savage's) part to kill Paterson, and that Savage did then and there, while Paterson was in that position, intentionally shoot Paterson, inflicting the mortal wound as alleged, of which Paterson died as alleged, and that Paterson had no pistol in his hands, nor before Savage grabbed, or did any act that indicated a purpose to draw one, the killing is not justifiable nor excusable, nor manslaughter, but murder in the first degree on the part of Savage, and if you believe from the evidence that Howard E. James was then present aiding and abetting Savage in such killing, by drawing a pistol after the scuffle or encounter commenced, with intent to assist or encourage Savage, then the act of Savage was, in contemplation of law, the act of James, and he is equally guilty with Savage as prin-

cipal in the second degree of murder in the first degree, and you may find them both guilty."

Each of these paragraphs was duly excepted to by the accused.

In the paragraph marked " 2 " we find language not strictly correct in this: the words " and intentionally shoot Paterson, killing him," should under our statute read thus: "And shoot Paterson, *intending to kill and did kill him*," etc. This is obvious because the law makes the premeditated *intent to kill* necessary to constitute murder in the first degree.

In the paragraph marked " 4," instead of the words " *rebuts* the presumption," etc., it should read " *tends to rebut* the presumption," etc.

In each of the paragraphs marked 2, 5 and 6 these words are substantially repeated: "And if James was present aiding and abetting he was guilty of the same offence as principal in the second degree." In each of the paragraphs last named this instruction is erroneous.

In Chitty's Criminal Law, Vol. 1, p. 258, we find this language: " But to constitute a principal in the second degree there must be not only a presence and an aiding and abetting, but a *participation in the felonious design*, or, at least, the offence must be within the compass of the original intention." This is the doctrine of the common law. The charge should be in effect that if James was present aiding and abetting Savage, knowing or believing that Savage intended to kill Paterson, or with a " premeditated design " to kill Paterson, aided and abetted Savage in his act, he was equally guilty with Savage.

The reason is that one who is guilty of murder in the first degree must be charged and proved to the satisfaction of the jury to have done the act charged with a formed design to effect the death, and this is the law as to the princi-

pal in the second degree as well as in the first degree. In other respects the law of the case is well formulated in each of the propositions excepted to.

After the Judge had concluded his charge to the jury counsel for the accused submitted the following in writing and requested that the same be given in charge to the jury:

"In this case the State is required to prove malice, deliberation and premeditation. There should be time and opportunity for deliberate thought, and after the mind concieves the thought of taking life the conception should be meditated upon, and a deliberate determination formed to do the act; but it makes no difference how soon after the fatal resolve is carried into execution."

And at the same time counsel for the accused submitted the following in writing, and requested that the same be given in charge to the jury, to-wit: "In order to justify a verdict of murder in the first degree it is not enough for the State to show that the defendants, or either of them, during the rencounter in which the fatal wound was given, considered whether he or they would flee from the combat. It must be shown beyond a reasonable doubt that prior to the infliction of the mortal wound, a premeditated, formed design existed in the minds of the prisoners to take the life of the deceased, and that sufficient time elapsed between the conception of the design to take life and the infliction of the mortal wound for them to meditate and deliberate upon the act of killing."

The Judge refused to give the instructions so prayed, the last upon the ground that his principal charge substantially covered the whole ground. Reading the whole charge we find it to have been very laboriously prepared, covering, as we believe, the whole law of this case. With the exception of the particulars indicated we have discovered noth-

ing to criticise in its exposition of the established law of homicide.

In respect to the propositions in the instructions asked for, they had been substantially and correctly given in the body of the charge.

In The People vs. Clark, 7 N. Y., 3 Selden, the court thus lay down the rule: "If there be sufficient deliberation to form a design to take life, and to put that design into execution by destroying life, there is sufficient deliberation to constitute murder, no matter whether the design be formed at the instant of striking the fatal blow or whether it be contemplated for months. *It is enough that the intention precedes the act, although that follows instantly.* The law has no favor to extend, either to the rapid or slow execution of such a design." The statute of New York is substantially in the language of our statute of 1868, except that in that State there was but one degree of murder at the time the case in 3 Selden was tried. The question of premeditation is one of fact, like other facts, to be determined by the jury.

In Drum's case (8 P. F. Smith, 16,) it is said: "It is true that such is the swiftness of human thought no time is so short in which a wicked man may not form a design to kill, and frame the means of executing his purpose; yet this suddenness is opposed to premeditation, and a jury must be well convinced upon the evidence that there was time to deliberate and premeditate. The law regards, and the jury must find, the actual intent, that is to say, the fully-formed purpose to kill, with so much time for deliberation and premeditation as to convince them that this purpose is not the immediate offspring of rashness and impetuous temper, and that the mind has become fully conscious of its own design. If there be time to frame in the mind fully and consciously the intention to kill, and to

select the weapon or means of death, and to think and know beforehand, though the time be short, the use to be made of it, then there is time to deliberate and premeditate." This was said in the case of a sudden affray, when the circumstances made it a serious question whether the act was premeditated or was the result of sudden and rash resentment. Jones vs. Com., 75 Pa. St., 403, quotes and endorses the foregoing as a fair exposition of the law under the statutes of that State. The law of Pennsylvania reads: " All murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of *wilful, deliberate and premeditated killing,* * * * shall be deemed murder in the first degree." And so we find that upon the precise point under consideration, the question of *deliberation,* which is a vital element in the crime of murder in the first degree, as defined by the Pennsylvania statute, is construed also in New York, under a statute like ours, that it is enough that the intention precedes the act, without regard to length of time, if there be time enough to form a design to take life and to put that design into execution.

The language of the instructions prayed is not quite sustained by the authorities. It is that " there should be time and opportunity for deliberate thought, and after the mind conceives the thought of taking life the conception should be meditated upon and a deliberate determination formed to do the act." There are here three stages of mental progress necessary to be established by the State according to this proposition : the conception of the thought of taking life, meditation upon the conception and thought, and finally deliberate determination after meditation followed by the execution of the original conception. These mental processes may be metaphysically the correct series necessary for every slayer to experience before being guilty of murder in the first degree ; but the law imposes, after all,

its penalties if the conception, the intention formed and the act, however closely following each other, are proved to exist and are imbued with malice.　61 Mo., 555, per Wagner, J.; 64 Mo., 321-2.

The Judge having given charges to the point in the language of approved authorities, it was not error to refuse to repeat them in other forms.

XIV. The sentence directs among other things that the Plaintiffs in Error be hanged by the sheriff of Hamilton county on the day to be named in the Executive warrant and within the walls of the jail of such county.

Our statute is like that obtaining in Massachusetts at the time of the Webster case, excepting that it provided for the execution to take place within the walls of a prison of the county in which *the conviction was had*, or within the enclosed yard of the prison; whereas, under ours, it is to take place within the walls or enclosure of a jail in the county *where such prisoner may be confined*.　In that case (5 Cush., 407,) the Supreme Court say: " It is not the duty or the province of the court to fix the time or place " of the execution.　The Governor, under our statute, is to fix the time, and his warrant should issue to and direct that it be executed by the sheriff of the county where such prisoner may, at the time of its issue, be confined, within the walls or enclosure of the jail or prison of such county.　The sheriff may, in his discretion, execute it within the walls or enclosure.　The sentence is erroneous to the extent indicated above.

The point was not suggested in argument, but for the purpose of settling the question we consider it.

For reasons stated, the judgment is reversed, the verdict set aside, and a new trial ordered.