**James C. LONG, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**Robree C. EARLE, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**William E. HUFF, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**Nos. 19073–19075.**

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 9, 1965.

Decided April 15, 1966.

Petition for Rehearing En Banc
Denied June 23, 1966.

Messrs. James R. Treese and Austin P. Frum, Washington, D. C., (appointed by this court) for appellant in No. 19,073.

Messrs. Max M. Kampelman and Daniel M. Singer, Washington, D. C., (appointed by this court) for appellant in No. 19,074.

Mr. George W. Mitchell, Washington, D. C., (appointed by this court), with whom Mr. Paul E. Miller, Washington, D. C., was on the brief, for appellant in No. 19,075.

Mr. John A. Terry, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee. Mr. John C. Conliff, Jr., U. S. Atty., at the time the record was filed, also entered an appearance for appellee.

Before WILBUR K. MILLER, Senior Circuit Judge, and DANAHER and BURGER, Circuit Judges.

BURGER, Circuit Judge.

Appellants were convicted of felony murder and, on jury recommendation, each was sentenced to life imprisonment.[1] The evidence showed Appellants had robbed and killed their victim in the early morning hours of August 25, 1963.

A multitude of errors are alleged. The claims applicable in common to the three Appellants are that the District Court erroneously (1) admitted into evidence a .38 caliber pistol claimed to be a fruit of a statement made in violation of the *Mallory*[2] rule; (2) permitted a witness to testify when that testimony was (a) also a fruit of the *Mallory*-barred statement, (b) was coerced by the government, and (c) was a violation of his Fifth Amendment right against self-incrimination; and (3) excluded two prospective jurors who expressed feelings against capital punishment.

In addition to the common contentions, each Appellant asserts claims of error

---

1. They were also found guilty of robbery, Earle and Long being sentenced to five to fifteen years and Huff to three to nine years. The sentences are to be served concurrently with those imposed for the murder.

2. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

applicable only to him. Earle urges that the Trial Court misled the jury in its insanity charge by conglomerating his insanity defense with that of a codefendant. Long claims ineffective assistance of counsel and an inadequate mental examination. Both Earle and Long also claim as error the judge's charge to the jury to consider only as impeachment evidence of their criminal records because they in fact did not testify and had themselves introduced their records to support a claim of insanity. Huff claims there was not enough evidence of his aiding and abetting to permit his case to go to the jury and that the instruction removed from the jury determination of a vital element of the government's proof of aiding and abetting.

The main evidence in the case against the Appellants came from Kenneth Clay, a juvenile participant in the crime.[3] He stated that he had been walking down a street Saturday night, August 24, when he saw Long, Earle, and Robert Robertson, another juvenile, in a car. Robertson called to him, and Clay entered the car. Huff joined the group later and drove the car. The group drove around for an hour or so. On Kalorama Road the car stopped and Earle, Long and Robertson got out. Clay and Huff stayed in the car. Long was carrying a .22 and Earle a .38 caliber revolver. As they accosted their victim and told him it was a holdup, Long pulled back the hammer on his gun. The victim hit Long's hand and the gun fired. Immediately another shot rang out. Long and Earle returned to the car, but Long then went back to the prostrate victim and took his wallet. The $30.00 in it was divided up among the five.

Appellants contend on various grounds that this testimony was inadmissible. Since Appellants' contentions are based on the fact that Clay made a statement to the police before being taken before a magistrate and on the circumstances surrounding his decision to testify at Appellants' trial, the background to Clay's testimony must be recounted in some detail.

The very night that the investigating officers discovered the names of the killers from a person who had learned of the robbery and killing from Clay, they also learned that Robertson, Earle, Long and Clay [4] had been arrested by other officers on a charge of unauthorized use of a vehicle. The investigating officers went to the precinct station at which the four were detained on the car charge and were told that a .22 caliber pistol had been found on the floor of the car in which the four had been riding.[5] The officers arrested Clay on the homicide charge and took him to headquarters, leaving the other three at the precinct station. They advised Clay he did not have to make a statement and that any statement he might make could be used against him. Clay, however, promptly admitted participation in the killing as soon as he got into the police car and had completed admission of his involvement and that of Long, Earle, Huff, and Robertson in the short time it took to travel the three blocks to headquarters.

In the Homicide Squad Office, while his statement was being reduced to writing, Clay volunteered information leading the police to the .38 revolver. He was never taken to a magistrate but, as a juvenile, was sent to the Receiving Home.

Appellants see this procedure as a violation of *Mallory* and urge that as fruits of this violation the .38 revolver and Clay's testimony were inadmissible, citing Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and Killough v. United States, 114 U.S. App.D.C. 305, 315 F.2d 241 (1962).

■ These contentions must fail, for many reasons. In the first place, there is

---

3. Clay was ordered committed for four years by the Juvenile Court.

4. Huff was already in jail for another, unrelated offense.

5. Appellants moved to suppress this gun before trial, but their motion was denied. No claim is made on appeal that this gun was not properly admitted into evidence.

no *Mallory* violation assuming, *arguendo*, *Mallory* applies to Clay's situation. His statement to the police was made immediately after his arrest on the homicide charge and before any delay occurred. *Mallory* does not bar all admissions made while in the custody of the police, United States v. Mitchell, 322 U. S. 65, 64 S.Ct. 896, 88 L.Ed. 1140 (1944). *Mallory* only applies when there is unnecessary delay in taking the arrested person to a committing magistrate. Furthermore, delay to provide for transcription of an oral confession before presentation to a magistrate has been held a reasonable and necessary practice. Muschette v. United States, 116 U.S.App. D.C. 239, 322 F.2d 989 (1963), reversed on other grounds, 378 U.S. 569, 84 S.Ct. 1927, 12 L.Ed.2d 1039 (1964).

Secondly, there is no requirement that a juvenile be taken to a magistrate after arrest. Thus *Mallory* is irrelevant. Edwards v. United States, 117 U.S.App. D.C. 383, 330 F.2d 849 (1964); Harling v. United States, 111 U.S.App.D.C. 174, 295 F.2d 161 (1961); see Harrison v. United States, Dec. 7, 1965, 123 U.S.App. D.C. ——, 359 F.2d 214.

Third, even if *Mallory* applied to juveniles and a violation of *Mallory* had occurred, Appellants could not raise the issue since no right of theirs was violated. Wong Sun v. United States, 371 U.S. 471, 492, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); see People v. Portelli, 15 N.Y.2d 235, 257 N.Y.S.2d 931, 205 N.E.2d 857 (1965), cert. denied, 382 U.S. 1009, 86 S.Ct. 612, 15 L.Ed.2d 524 (1966).

The contention that the .38 caliber pistol and Clay's testimony were inadmissible as fruits of a *Mallory*-tainted statement is thus without foundation.

Appellants further argue that Clay's testimony was coerced and that the Trial Judge erred in ruling that Clay waived his privilege against self-incrimination. When first called at the trial by the government, Clay admitted being "involved" in the killing but refused to testify further, saying merely that he did not want to. The trial was thereupon recessed. The next day, after Clay had consulted with his two lawyers, he was again called to the stand by the government. He again refused to answer "because this trial has nothing to do with me," because "I got my time," and because "I don't like to see people going to jail." At this point defense counsel objected to Clay's being made to testify, saying that Clay had been intimidated by the assistant United States attorney during an interview the day before when the prosecutor had said that he would put Clay on the witness stand as a hostile witness and pull the testimony out of him if he did not volunteer to testify for the government. The Court denied the motion on the grounds that intimidation even if assumed would not prevent a witness from testifying, but could be argued as affecting credibility.

One of Clay's lawyers then sought to assert in Clay's behalf his privilege against self-incrimination, while the other told the Court that he had advised Clay to testify and tell the truth. Clay took the stand and again refused to testify, still on grounds other than self-incrimination. Repeated efforts by one of his two lawyers to have him invoke the Fifth Amendment were unavailing, but after another recess, during which counsel explained the privilege to Clay, Clay did invoke the privilege. The Court sustained his exercise of the privilege. However, when the government asked specific questions out of the presence of the jury to require Clay to invoke the privilege as to particular questions, Clay answered them responsively.

The next day, Clay's counsel who had urged invoking the Fifth Amendment informed the Court that he had again talked with his client and that Clay "has now indicated to me * * * that it is now his intention to testify and I am satisfied that that is his desire and his wish; and he has been fully advised as to his rights with reference to it." Over defense counsel objections, Clay testified before the jury, giving damaging evidence against Appellants.

■ To argue on this record that the government coerced Clay to testify is totally baseless. Apart from the claim that Clay's initial statement was coerced because he was not advised of his rights by a magistrate, Appellants' claim rests on the prosecutor's statement to Clay at the interview that if he did not testify willingly the government would treat him as a hostile witness and draw his testimony from him.[6] This is characterized by Appellants as intimidation. But whatever its effect on Clay, a statement of the government's intention to examine a witness in open court, as permitted by law, cannot be regarded as coercive. Moreover, to argue in terms of coercion is misleading, since any reluctant witness called to testify by subpoena is always "coerced" in that he risks imprisonment for contempt if he refuses, without right, to do so.

■■ Even if Clay had been coerced, Appellants would not have standing to object to his testimony. *Wong Sun, supra.*[7] Appellants, however, could have presented the background of Clay's testimony to the jury as bearing on credibility; the Trial Judge so ruled but Appellants did not make any effort to bring to the attention of the jury the factors which they allege to be coercive. Their complaint here that the jury was misled into believing that Clay's testimony was purely voluntary cannot be heard when this was their choice.

■ As we read the record, furthermore, the District Judge carefully protected Clay's right under the Fifth Amendment; only when Clay, with advice of counsel, made clear his desire to testify, did the Court allow him to proceed. Even assuming Clay's waiver of the Fifth Amendment was not an informed decision, Appellant would not be able to claim this as error. "Where the witness is not the party, the party may not claim the privilege nor take advantage of an error of the court in overruling it." Bowman v. United States, 350 F.2d 913, 916 (9th Cir. 1965).

Appellants claim that the District Judge excluded two persons from the jury because they expressed scruples against capital punishment. Under Turberville v. United States, 112 U.S.App. D.C. 400, 303 F.2d 411 (1962), cert. denied, 370 U.S. 946, 82 S.Ct. 1596, 8 L.Ed. 2d 813 (1962), the District Judge is to ask prospective jurors not merely whether they are opposed to the death penalty but also, if opposed, whether this private sentiment would prevent them from rendering a fair verdict on the basis of the evidence. Appellants concede that this practice was followed with regard to the others but argue that it was not done with these two. This does not appear from the record to be the case.

■ The District Judge seems to have felt that one prospective juror had prejudged the case. The other rose in answer to the question, "Is there any other juror by reason of conscience that feels he could not or she could not serve fairly and impartially in this case because of the possibility that the death penalty could be recommended by the jury?" She was then excused when she said she had feelings against capital punishment. Her rejection, then, was not on the basis merely of an opposition to the death penalty but was based also on her rising in answer to the question whether her opposition would indeed prevent her from serving impartially.

---

6. Appellants also argue as part of what they see as a coercive pattern the fact that Clay was kept in solitary confinement at the National Training School for six months prior to trial. In an effort to buttress this claim, Appellants put into evidence a letter from the Superintendent of the School. This letter, however, said that the Superintendent felt it was necessary to put Clay in solitary to protect him from his fellow inmates who might bring "pressure upon him because of his intent to testify." Rather than being coercive, therefore, this detention was intended to prevent Clay from being coerced.

7. A recent New York case held that if the witness had been tortured his testimony would still not be rendered inadmissible. People v. Portelli, *supra.*

Appellants Earle and Long both raised a claim of "insanity"; each offered a history of disciplinary problems and a psychiatrist who said he was suffering from a mental disease or defect and that the crime was its product. To buttress this claim, Earle and Long also introduced their criminal records into evidence.

Long urges that his commitment to Saint Elizabeths Hospital for a mental examination was inadequate since is was for only thirteen days. There is, however, "no set period required for a mental examination." Wynder v. United States, 122 U.S.App.D.C. 186, 352 F.2d 662, 663 (1965). If the psychiatrists thought more time was needed to make the necessary examination, they could have requested more time. Absent such a request, Long could have sought testimony from his own or the examining psychiatrists that the commitment was not adequate. He points to no such testimony. Further, Long was not prejudiced by whatever deficiency there may have been in the examination since he offered not only lay witnesses but also his own expert to testify that he was mentally ill.

Earle argues that the District Judge erred because his criminal responsibility charge under McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962), linked Earle's case with Long's, which, Earle contends, was a weaker case. He argues that the jury must have felt that it had to find both of them "insane" or neither of them. Regardless of what differences there may have been in the proof offered by the two, the basic issue was the same; moreover, the District Court already had carefully instructed the jury that it must return a separate verdict as to each defendant under each count and provided them with separate forms for each defendant.

Appellants Earle and Long claim error in another portion of the charge, in which the District Judge told the jury it could consider the criminal records of Earle and Long only as bearing on their credibility as witnesses. The charge was inappropriate, and apparently inadvertent, since neither Long nor Earle testified. In the circumstances this was harmless error; we note no objection was made on this score at the time.

Long also claims that the District Court failed to provide him with effective assistance of counsel in the six months between arraignment and trial. Appointed counsel had become incapacitated because of an automobile accident, but new counsel was appointed more than two months before trial. Claims of reversal premised on the absence of a lawyer at that stage must demonstrate prejudice. Cf. Kennedy v. United States, 122 U.S.App.D.C. 291, 353 F.2d 462 (1965). The only prejudice that Long alleges is that the absence of counsel in the interim before trial prevented him from getting a longer mental examination. As already pointed out, Long received an adequate mental examination; hence, there is no prejudice. Furthermore, Long's counsel agreed to the trial scheduling and did not seek an extension of time either to prepare more fully for trial or to facilitate a longer mental examination of his client at St. Elizabeths.

Appellant Huff's case is somewhat different from that of the other two Appellants. Clay's testimony was that Huff drove the others to Kalorama Road, stayed nearby in the car while Earle and Long were attacking the victim; Huff then drove the car away from the scene, fully aware of what had taken place. This was abundant evidence of Huff's aiding and abetting the others. It is necessary only that the defendant knowingly associate himself in some way with the criminal venture to be an aider and abettor. Nye & Nissen v. United States, 336 U.S. 613, 69 S.Ct. 766, 93 L. Ed. 919 (1949). Mere presence would be enough if it is intended to and does aid the primary actors. United States v. Garguilo, 310 F.2d 249 (2d Cir. 1962) (dictum). The Trial Judge was correct in holding that the case against Huff was strong enough to submit to the jury.

■ Huff claims that the District Judge took from the jury the choice as to the guilty nature of the act of driving the automobile by instructing that they *could* find him an aider and abettor if he "aided and assisted the principal offenders in leaving the scene of the offense by willingly and knowingly continuing to drive the automobile." This took no choice from the jury, but merely stated the law that they were permitted to find Huff an aider and abettor *if they believed* his driving the "getaway" car assisted in the flight of the culprits.

Affirmed.