**Lakeisha WILSON–BEY, Appellant,**

v.

**UNITED STATES, Appellee.,**

and

**Sckeena MARBURY, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 01–CF–293, 01–CF–633.**

District of Columbia Court of Appeals.

Argued Sept. 28, 2004.

Decided April 7, 2005.

John O. Iweanoge, Jr., Washington, for appellant Lakeisha Wilson–Bey.

Matthew M. Hoffman, Washington, with whom John Moustakas and Stephen R.

Galoob were on the brief, for appellant Sckeena Marbury.

John P. Gidez, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Elizabeth Trosman, and Lynn C. Holliday, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and SCHWELB and REID, Associate Judges.

SCHWELB, Associate Judge:

Following a jury trial, Lakeisha Wilson–Bey and Sckeena Marbury, who are sisters, were both convicted of first-degree premeditated murder while armed, in violation of D.C.Code §§ 22–2401, –3202 (1996).[1] The two women were also found guilty of several other offenses stemming from the same homicide.[2] The prosecution's theory at trial was that Ms. Wilson–Bey was the principal in the premeditated murder of Tomika Blackwell and that Ms. Marbury participated as an aider and abettor.

On appeal, both women raise a number of issues, but only one claim—the contention that the trial judge instructed the jury erroneously with respect to the "intent" element of "aiding and abetting" first-degree premeditated murder—requires extended discussion. The parties disagree over the question whether this claim has been preserved. The government points out, correctly, that neither appellant asserted in the trial court that the Redbook Instruction No. 4.02 (aiding and abetting),[3] which the trial judge included with one modification in his charge, should not be given in premeditated murder cases. The appellants point out, also correctly that, in its initial brief, the government did not argue that appellants had waived the issue, or that a plain error standard of review should be applied. According to appellants, the government has therefore "waived the waiver."[4] We need not re-

---

**1.** This offense is now recodified in D.C.Code §§ 22–2101, –4502 (2001).

**2.** These offenses were the following:

| | |
|---|---|
| Conspiracy to Commit Murder and Assault | D.C.Code § 22-105(a) (1996), recodified in § 22-1805(a) (2001); |
| Assault with a Dangerous Weapon | D.C.Code § 22-502 (1996), recodified in § 22-402 (2001); |
| Aggravated Assault While Armed | D.C.Code §§ 22-504.1, -3202 (1996), recodified in §§ 22-404.01, -4502 (2001); |
| Malicious Destruction of Property | D.C.Code § 22-403 (1996), recodified in § 22-303 (2001); |
| Threats to Injure a Person | D.C.Code § 22-2307 (1996), recodified in § 22-1810 (2001); |
| Carrying a Dangerous Weapon | D.C.Code § 22-3204(a) (1996), recodified in § 22-4504(a) (2001). |

**3.** CRIMINAL JURY INSTRUCTIONS OF THE DISTRICT OF COLUMBIA, No. 4.02 (1993).

**4.** There is authority both for and against appellants' "waiver of the waiver" theory. *Compare In re T.L.,* 859 A.2d 1087, 1090 n. 6 (D.C.2004); *United States v. Delgado–Garcia,* 362 U.S.App. D.C. 512, 374 F.3d 1337, 1340 (2004); and *United States v. Leichtnam,* 948 F.2d 370, 375 (7th Cir.1991) (generally supporting the theory); *with United States v.*

solve the dispute over the applicable standard of review because, assuming, *arguendo,* that we should treat appellants' claim as having been preserved, we are compelled by controlling case law, and in particular *Daniels v. United States,* 738 A.2d 240, 246–47 (D.C.1999), and *Byrd v. United States,* 364 A.2d 1215, 1219 (D.C.1976), to reject that claim on the merits. Accordingly, we affirm appellants' convictions.

## I.

### THE EVIDENCE

On the evening of January 16–17, 2000, several young women were playing cards and drinking in an apartment in southeast Washington, D.C. An argument broke out between the decedent, Ms. Blackwell, and appellant, Sckeena Marbury, who was quite inebriated. After the women left the apartment, the dispute escalated from words to blows. Much to Ms. Marbury's chagrin, Ms. Blackwell easily bested her in the fight that followed. At the conclusion of the encounter, Ms. Marbury was lying on the ground with a bloody nose and with a knot on her head. Rankled by defeat and humiliation, with her judgment perhaps affected by the consumption of an immoderate amount of alcohol, Ms. Marbury wanted revenge.

In the hours after the fight, Ms. Marbury related to a few of her friends that she had been "jumped" by Tomika Blackwell and two of Tomika's friends. Appellant Lakeisha Wilson–Bey, who had previously clashed with Ms. Blackwell, was notified of her younger sister's beef, and eventually a group of eight young women,

including both appellants, armed themselves with knives and baseball bats and set out in a van for Ms. Blackwell's apartment. Their ostensible plan was to find out why Ms. Marbury had been beaten up and to avenge Ms. Marbury by fighting and vanquishing Ms. Blackwell and her friends. All of the women in the van were subsequently charged with first-degree premeditated murder while armed, but several of them agreed to cooperate with the government in exchange for comparatively favorable plea agreements, and three testified at trial against the appellants.[5] The facts described below are based largely on their testimony and that of Ms. Blackwell's boyfriend, Arnold Rucker.

The van in which the group of eight travelled to seek out Ms. Blackwell was owned and driven by appellants' friend, Angel Lewis. According to one of the participants in this ill-advised expedition, Ms. Wilson–Bey announced her intention to kill "that bitch," referring to Ms. Blackwell;[6] this threat was allegedly made in the presence of several of the young women, including Ms. Marbury. There was also testimony that Ms. Wilson–Bey later expressed the belief that she had in fact killed Tomika. Another witness, Teresa Brown, testified that Ms. Marbury had also stated her intention to kill Ms. Blackwell. The prosecution witnesses were all impeached, at least in some measure, but there was evidence which, if credited, would permit an impartial jury to find that both appellants set out deliberately to murder Ms. Blackwell in retaliation for her

---

*Vontsteen,* 950 F.2d 1086, 1092 (5th Cir. 1992); and *United States v. Rose,* 104 F.3d 1408, 1414 (1st Cir.1997) (declining to hold that the government waived the waiver). The call is a discretionary one for the appellate court. *Rose,* 104 F.3d at 1414.

5. Ms. Wilson–Bey's attorney called two of the "cooperating witnesses" to testify on his client's behalf.

6. Ms. Wilson–Bey also allegedly used the expression "fuck [her] up" with respect to her plans for Ms. Blackwell.

having beaten up Ms. Marbury, and that Ms. Wilson–Bey executed this premeditated plan.

When the van arrived outside Ms. Blackwell's apartment house, the two appellants and their friend Lashawn Miller ran up to Ms. Blackwell's unit, Apartment 304. According to prosecution witnesses, Ms. Wilson–Bey had a butcher knife in her hand, and Ms. Marbury was carrying both a bat and a knife. The other occupants of the van, several of them armed, followed the initial trio up the stairs.

At the time the revenge-seekers arrived on the scene, Ms. Blackwell was inside the apartment with her boyfriend, Arnold Rucker, and another woman. Rucker became aware of the commotion outside, and he heard someone calling for Ms. Blackwell. Rucker opened the door, and he observed what he described as "a rack of females" in the hall. He testified that several of the women were carrying weapons. Rucker did not know Ms. Wilson–Bey, but he recognized Ms. Marbury as the young woman whom Ms. Blackwell had fought and conquered earlier that night. According to Rucker, Ms. Wilson–Bey was at the head of the group, holding the butcher knife, and she asked for Ms. Blackwell. Ms. Blackwell walked to the door, stood behind Rucker, and announced: "I'm right here." Although she was not armed, Ms. Blackwell advanced on Ms. Wilson–Bey. Rucker tried unsuccessfully to restrain Ms. Blackwell, but while he was attempting to do so, Ms. Wilson–Bey swung the knife at Ms. Blackwell several times, inflicting a stab wound near her victim's right eye. Ms. Blackwell, bleeding profusely, nevertheless tried to fight her knife-wielding assailant. The two women struggled on the floor, and during the ensuing melee, Ms. Wilson (and perhaps others) [7] stabbed Ms. Blackwell several more times. One witness testified that Ms. Marbury struck Ms. Blackwell with a bat while Ms. Wilson–Bey was stabbing her; according to Rucker, however, Ms. Marbury, who by all accounts was very drunk, was just standing there, crying.

Unfortunately, Ms. Blackwell's injuries were fatal. At approximately 4:00 a.m. on the morning of January 17, officers from the Metropolitan Police Department arrived at the apartment. They found Ms. Blackwell unconscious and suffering from multiple wounds to the face and body. The officers transported Ms. Blackwell to D.C. General Hospital. At 4:30 a.m., Tomika Blackwell was pronounced dead.

Ms. Blackwell was not the only person who suffered injury to person or property as a result of the criminal activities of the appellants and of the other members of their group. Arnold Rucker was stabbed in the arm, and although he left the hospital before being treated,[8] he later testified that he suffered intense pain for two weeks. Moreover, after the appellants and their friends left Ms. Blackwell bleeding to death in her apartment, they proceeded to the home of Teresa Brown, Ms. Blackwell's friend; they did so because Ms. Marbury had stated that Ms. Brown had helped Ms. Blackwell to attack Ms. Marbury. Upon arrival at Teresa Brown's apartment house, the women tried to locate Ms. Brown's apartment, yelled at Ms.

7. Gravely injured, Ms. Blackwell said that "[t]hose bitches stabbed me" and that "I'm going to die this time." Apparently, the decedent believed that Ms. Wilson–Bey was not the only person who stabbed her. There was also expert testimony that Ms. Blackwell's death was caused by wounds inflicted by a knife smaller than the butcher knife that Ms. Wilson–Bey was carrying.

8. Rucker was apparently wanted by the police.

Brown to come out, and Ms. Wilson–Bey threatened to kill her. When Ms. Brown declined to come down, they took turns stomping on Ms. Brown's automobile and also shattered the car windows, inflicting over $700 worth of damage.

A forensic pathologist called by counsel for Ms. Wilson–Bey testified that Ms. Blackwell died as a result of a stab wound in the neck. The witness opined that the fatal injury had been inflicted by a small knife with a narrow blade, and could not have been caused by a large knife such as the one Ms. Wilson–Bey was carrying.[9] At the trial, Ms. Wilson–Bey's attorney contended that his client neither killed the decedent nor intended to do so. Abandoning his initial theory that Ms. Wilson was not present when the decedent was stabbed,[10] counsel also argued that Ms. Wilson–Bey was acting in self-defense. Ms. Marbury's defense was essentially that she was drunk and that she took no part in the armed assault on Ms. Blackwell. Neither appellant testified.

## II.

### THE AIDING AND ABETTING INSTRUCTION

■ Although, at trial, the government identified Ms. Wilson–Bey as the principal in the armed premeditated murder of Ms. Blackwell, the prosecutor contended that, as an aider or abettor, Ms. Marbury was guilty of the same offense. The prosecutor asked the court to make it clear to the jury that Ms. Marbury

did not have to go with the specific intent to commit the ultimate crime, which in this case would be the killing. [A]ll [that] would be necessary was that she participate in some unlawful manner while present and that she have some desire to participate and to make whatever the unlawful purpose was to succeed in this case.

Subsequently, the prosecutor added:

[O]ur concern is that the jurors would think that the crime in this case is the ultimate crime which was the murder, as opposed to the defendant being guilty if they [sic] participated in any unlawful way at the scene, whether there was the intent to kill, which was the crime, or merely participated in the assault.

... I want the jury ... to be clear that as long as they're there and participating [in] the assault, what's going on on that platform, then [all] the defendants can be found guilty [of premeditated murder]. This all goes to foreseeability, natural and reasonable consequences of the acts. I just don't want them to hold the defendants to the commission of the murder.

In order to accomplish the goal of making it clear to the jury that Ms. Marbury could properly be convicted of premeditated murder without intending that Ms. Blackwell be killed, the prosecutor asked the trial judge to modify Instruction 4.02 (Aiding and Abetting) of the 1993 Redbook [11] by making intentional participation in a "criminal venture" (and not merely in a crime) a sufficient basis for conviction. The judge expressed agreement with the

9. There was testimony that one of the appellants' friends subsequently discarded the butcher knife at Ms. Wilson–Bey's direction.

10. In his opening statement, Ms. Wilson–Bey's attorney had claimed that Ms. Wilson–Bey was not even on the scene of the stabbing. Subsequently, all of the witnesses, in-

cluding the two called by Ms. Wilson–Bey's attorney, testified to the contrary.

11. CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA (4th ed.1993), Instruction 4.02.

prosecutor's approach, and he modified Redbook Instruction No. 4.02 by adding the language italicized below:

> Any person who in some way intentionally participates in the commission of a crime *or a criminal venture*, aid[s] and abets the criminal offender. She, therefore, is as guilty of the crime as she would be if she had personally committed each of the acts that make up the crime.
>
> To find that the defendant aided and abetted in committing a crime, you must find that the defendant knowingly associated herself with the person who committed the crime *or criminal venture*, that she participated in the crime *or criminal venture* as something she wished to bring about, and that she intended by her actions to make it succeed.

(Emphasis added.)[12]

The judge also instructed the jury as follows:

> *It is not necessary that the defendant have had the same intent that the principal offender had when the crime was committed* or that she have intended to commit the particular crime by the principal offender. An aider and abett[o]r is legally responsible for the acts of other persons *that are the natural and probable consequences of the crime or criminal venture in which she intentionally participates.*

(Emphasis added.) The court's instruction as given did not require the prosecution to prove either that Ms. Marbury acted upon a premeditated design to kill Ms. Blackwell or that Ms. Marbury knew that someone else intended to kill the decedent. *Cf. Hackney v. United States,* 389 A.2d 1336, 1341 (D.C.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 95 (1979) (quoting ROLLIN M. PERKINS, CRIMINAL LAW 662 (2d ed.1969)).

Ms. Marbury's attorney objected to the insertion into the Redbook Instruction No. 4.02 of the "criminal venture" language. He complained that

> [i]f you put criminal venture, it negates the same intent as the principal and it makes—just makes her responsible for anything that happens there. I mean regardless whether or not she had specific intent or whether or not she was just there. I mean—and that wording it says, look, if you're [there], regardless what happens, you're responsible for it if you use criminal venture.[13]

Both appellants were found guilty, *inter alia,* of first-degree premeditated murder while armed. Each was sentenced to serve an aggregate term of thirty-six years to life, and each filed a timely notice of appeal.

---

12. The judge defined the criminal venture as follows: ·

    Now, when I refer to criminal venture, the criminal venture in this case was to assault and murder Tamika Blackwell and to assault Teresa Brown and Diamonika Thompson.

    The appellants had been charged with assaulting Diamonika Thompson, whom the reader has not previously encountered, as well as Ms. Blackwell and Ms. Brown. The prosecution did not, however, call Ms. Thompson as a witness; she testified instead, as a defense witness for Ms. Wilson–Bey.

13. As we have previously noted, however, neither defendant objected to any of the language in the Redbook instruction itself, and there was no suggestion by the defense that the standardized aiding and abetting instruction was not appropriate in cases of first-degree premeditated murder. In any event, we do not believe that the judge's use of the phrase "or criminal venture" affects the outcome of the trial or of these appeals in any way.

## III.

## THE REQUISITE PROOF OF INTENT

On appeal, Ms. Marbury's basic position, joined by Ms. Wilson–Bey,[14] is that in first-degree premeditated murder cases, the Redbook instructions on aiding and abetting are inadequate and that they understate the requisite intent. In this court, Ms. Marbury is not simply complaining, as she did in the trial court, that the "criminal venture" language should not have been added to Redbook instruction No. 4.02. Rather, she argues that "[i]f the charge is first[-]degree murder based upon an alleged deliberate and premeditated killing, the abettor is not guilty of this degree of the crime unless he [or she] *either acted upon a premeditated design to cause the death of the deceased or knew that the perpetrator was acting with such an intent. . . .*" *Hackney,* 389 A.2d at 1341 (emphasis added) (quoting PERKINS at 662). Further, Ms. Marbury invokes another leading commentary, as follows:

> To determine the kind of homicide of which the accomplice is guilty, it is necessary to look to his state of mind; it may have been different from the state of mind of the principal and they thus may be guilty of different offenses. *Thus, because first-degree murder requires a deliberate and premeditated killing, an accomplice is not guilty of this degree of murder unless he acted with premeditation and deliberation.*

WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 13.2(c), at 347 (2d ed.2003) (emphasis added).

Further, Ms. Marbury now complains of the use in premeditated murder cases of the "natural and probable consequence" language contained in Redbook instruction No. 4.02 and included in the trial judge's charge to the jury in this case. Ms. Marbury again quotes Professor LaFave:

> [G]eneral application of the "natural and probable consequence" rule of accomplice liability is unwarranted. *A*'s guilt as an accomplice to one crime should not per se be a basis for holding *A* accountable for a related crime merely because the latter offense was carried out by *A*'s principal, for this as well would result in *A*'s guilt of a crime as to which he did not have the requisite mental state.

*Id.,* § 13.3(b), at 362–63.[15]

In assessing appellants' contentions, we begin with D.C.Code § 22–105 (1996), now recodified in D.C.Code § 22–1805 (2001), which reads as follows:

> In prosecutions for any criminal offense all persons advising, inciting, or conniving at the offense, or aiding or abetting the principal offender, shall be charged as principals and not as accessories, the intent of this section being that as to all accessories before the fact the law heretofore applicable in cases of misdemeanor only shall apply to all crimes, whatever the punishment may be.

**14.** Although, according to the prosecution, Ms. Wilson–Bey was the principal in the premeditated murder, and not merely an accomplice, the contested aiding and abetting instructions potentially affected her as well. In light of the expert testimony to the effect that the fatal wound could not have been inflicted by a butcher knife as large as the weapon carried by Ms. Wilson–Bey, this appellant could theoretically have been an aider and abettor to another person who inflicted the fatal wound.

**15.** Professor LaFave would confine the "natural and probable consequences" principle to "unique situations in which unusual principles of liability obtain," such as felony-murder and misdemeanor-manslaughter. *Id.*

The language of the statute does not appear to contemplate a variable standard for aiding and abetting depending on the nature of the offense charged.

In *United States v. Peoni*, 100 F.2d 401 (2d Cir.1938), Judge Learned Hand, writing for the court, discussed various historical formulae addressing this elusive doctrine. Judge Hand concluded that the various articulations

> ... all demand that [the accessory or aider and abettor] in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.

*Id.* at 402. This definition of aiding and abetting has subsequently been adopted by the Supreme Court, *see Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949), and by this court, *see Brooks v. United States*, 599 A.2d 1094, 1099 (D.C.1991); *Hackney*, 389 A.2d at 1342,[16] and appears to be consistent with our aiding and abetting statute quoted above.

More recently, in *Owens v. United States*, 688 A.2d 399, 403 (D.C.1996), we stated that "[i]n general, one may be convicted on a theory of aiding and abetting if one knowingly associates oneself with a criminal venture and engages in conduct in furtherance of the offense." We have also made it clear that although "natural and probable consequences" implies some degree of foreseeability, "there is no requirement that the aider and abettor have the identical intent of the principal at the time and place." *Ingram v. United States*, 592 A.2d 992, 1001–02 (D.C.1991) (citations and internal quotation marks omitted). The trial judge's instructions in this case are generally consistent with these decisions.

The application of the foregoing principles to premeditated murder presents some analytical difficulty. Our statutory law provides that a person of sound memory and discretion who "kills another purposely, ... [with] deliberate and premeditated malice" is guilty of murder in the first degree. D.C.Code § 22–2401 (1996); D.C.Code § 22–2101 (2001). "Deliberation" and "premeditation" thus go to the very essence of the crime. Thus, if the aider and abettor must be shown to have "associate[d][her]self with the venture" of premeditated killing, and if the prosecution must prove that the accomplice participated in it "as in something that [she] wishes to bring about" and "s[ought] by [her] action to make it succeed," *Peoni*, 100 F.2d at 402, then logic arguably requires proof that the accomplice both knew of the principal's intention to commit a premeditated murder and wanted the principal to succeed in that endeavor (by killing the decedent).

*Hackney*, a premeditated murder case on which appellants rely, appears at first blush to support their position. There is language in the court's opinion apparently requiring the prosecution to prove, beyond a reasonable doubt, that the accomplice *"either acted upon a premeditated design to cause the death of the deceased or knew that the perpetrator was acting with such an intent...."* *Hackney*, 389 A.2d at 1341 (emphasis added) (quoting PERKINS at 662). In other words, in this part of the *Hackney* opinion, this court evidently approved the PERKINS standard. Later in the opinion, however, the court stated that

> although there must exist a community of unlawful intent between the accessory and the perpetrator of the crime: "[i]t is

---

**16.** Indeed, the trial judge's instructions in this case, quoted at page 9–10, *supra,* are derived from the language in *Peoni.*

well settled ... that [the accessory] need not necessarily have intended the particular crime committed by the principal; *an accessory is liable for any criminal act which in the ordinary course of things was the natural or probable consequence of the crime that he advised or commanded, although such consequence may not have been intended by him.*"

*Hackney,* 389 A.2d at 1342 (emphasis added) (quoting 22 C.J.S. Criminal Law § 92 at 164 (1961)).[17] The court thus approved the "natural and probable consequence" standard, which appellants, citing Professor LaFave, claim to be inapplicable to prosecutions for premeditated murder.

In our view, the two italicized statements in *Hackney* are difficult to reconcile with one another. The PERKINS standard, which is consistent with the logic of *Peoni,* requires proof either that the accomplice had the "premeditated design" to kill the decedent or that she knew that the principal acted pursuant to such a design. Under the "natural and probable consequence" standard, on the other hand, the government need not establish that the aider and abettor acted from a premeditated design to kill, nor is it required to prove knowledge on the accessory's part that the principal had so acted; it is sufficient that the decedent's death be the "natural and probable consequence" of the accomplice's intentional conduct.[18] In light of the apparently inconsistent statements in the

court's opinion, we do not believe that *Hackney* is controlling authority either in favor of the appellants or for the government.

But assuming that *Hackney* is inconclusive, decisions of this court both before and after that decision was rendered establish that the principles governing accomplice liability in first-degree premeditated murder cases are identical to those applicable to aiders and abettors of other offenses. The earlier of the cases in which we so held, *Byrd v. United States,* 364 A.2d 1215 (D.C.1976), involved the armed first-degree murder of a service station attendant. In *Byrd,* the accomplice, Crowe, drove the principal, Byrd, first to the location where Byrd obtained a handgun, and then to the service station where Byrd shot the decedent. After the murder, Crowe drove the car as the two men sought to make their escape. Following his conviction, Crowe contended on appeal that the evidence was insufficient to support his conviction as an aider and abettor.

This court rejected Crowe's contention and affirmed his conviction. Citing D.C.Code § 22–105 (1973) and the Supreme Court's decision in *Nye & Nissen,* 336 U.S. at 619, 69 S.Ct. 766 (a conspiracy to defraud case), the court found it to be "well established that an individual who knowingly participates in the commission of a criminal act by assisting the principal is equally liable." 364 A.2d at 1219. The court stated that "[t]he elements to estab-

---

**17.** It should also be noted that the court in *Hackney* affirmed the defendant's conviction, even though, so far as we can discern from the opinion, the trial court's instructions, taken from the REDBOOK, did not require the prosecution to satisfy the standard articulated in PERKINS, and certainly not the even more exacting standard proposed in LAFAVE.

**18.** This is not to suggest, however, that the "natural and probable consequences" stan-

dard is toothless. For example, "in testing sufficiency of the evidence for conviction of an aider and abettor of an armed robbery ... we [have] held that the 'natural and probable consequence' of the alleged accomplice's actions will not lead to complicity with an armed (rather than unarmed) offense unless the accused could reasonably foresee [that] a weapon would be 'required.'" *Ingram,* 592 A.2d at 1003 (quoting *Hordge v. United States,* 545 A.2d 1249, 1256 (D.C.1988)).

lish aiding and abetting are (1) that an offense was committed by someone; (2) that the accused assisted or participated in its commission; and (3) that he did so with guilty knowledge." *Id.* (citations omitted). Applying these elements to the record before it, the court concluded that the evidence was sufficient to sustain Crowe's conviction as an aider and abettor. In support of its conclusion, the court cited *United States v. Harris,* 140 U.S.App. D.C. 270, 285, 435 F.2d 74, 89 (1970) (defendant charged with aiding and abetting armed robbery and assault with a dangerous weapon); *Thompson v. United States,* 132 U.S.App. D.C. 38, 405 F.2d 1106 (1968) (aiding and abetting assault and robbery); and *Long v. United States,* 124 U.S.App. D.C. 14, 20–21, 360 F.2d 829, 835–36 (1966) (a prosecution for aiding and abetting felony murder). Thus, in the first-degree premeditated murder case before it, the court in *Byrd* relied on substantive aiding and abetting standards applied in prosecutions for criminal offenses not involving premeditation and deliberation at all.

■ More recently, in *Daniels v. United States,* 738 A.2d 240 (D.C.1999), we affirmed the conviction of the defendant Campbell of armed first-degree premeditated murder on an aiding and abetting theory. The court discussed our precedents in detail, and made it plain that conventional principles from cases involving aiding and abetting other offenses were fully applicable:

> One who aids and abets another person in committing an offense shares the liability of the principal for all acts committed in furtherance of the common purpose, if the act done either is within the scope of that purpose, or is the natural or probable consequence of the act intended.

*Id.* at 246 (citations and internal quotation marks omitted). After describing the as-sistance provided by Campbell, the court concluded that

> [f]rom this evidence, a reasonable juror could infer that death was a natural and probable consequence of Campbell's driving two armed men to a particular place so that they could "wet" someone, waiting for their return after hearing gunshots, ensuring that the back seat was clear to facilitate their getaway, and then driving them away from the murder scene to complete their escape. *See Byrd v. United States,* 364 A.2d 1215, 1219 (D.C.1976) (affirming conviction of aider and abettor who drove the principal to the scene of the crime, waited in the car while he committed the crime, and then drove the principal away from the scene); *Bailey v. United States,* 128 U.S.App. D.C. 354, 359, 389 F.2d 305, 310 (1967) (same); *Long v. United States,* 124 U.S.App. D.C. 14, 20–21, 360 F.2d 829, 835–836 (1966) (same). *We see no material difference between the present case and any of these three cases, and thus we find no merit in Campbell's sufficiency argument.*

*Id.* at 247 (emphasis added). Of the three cases which the court described as indistinguishable from *Daniels* at the conclusion of the quoted passage, one (*Byrd,* which we have discussed at pages 1163–64, *supra*) involved aiding and abetting premeditated murder. *Bailey,* however, was a robbery prosecution, and the defendant in *Long* was convicted of *felony* murder; neither case required proof of premeditation or deliberation. The conclusion is thus inescapable that, in this jurisdiction, we must apply to premeditated murder cases all of the conventional principles of aiding and abetting law, including the doctrine that the accomplice need not be shown to have the same intent as the principal and that the "natural and proba-

ble consequence of the act intended" standard applies.

It is true that *Byrd* and *Daniels* deal with the sufficiency of the evidence, and that there is no indication in these opinions that there was any objection to the instructions of the court. In light of the legal principles articulated in these decisions, and especially in *Daniels,* however, any claim that premeditated murder cases require different aiding and abetting instructions for those given in other aiding and abetting cases could not logically have been sustained. We are therefore constrained to conclude that, notwithstanding the views stated in PERKINS and LA-FAVE, and the apparent flirtation in *Hackney* with the PERKINS approach, the instructions of the trial court of which appellants now complain are consistent with our precedents, and we are duty-bound to follow them.

We think it important to note, however, that so far as we are aware, the positions taken by PERKINS and LAFAVE were not presented to the court in the cases which we deem dispositive, *i.e., Byrd* and *Daniels.* The views of the two commentators are consistent with decisions in a number of other jurisdictions, and they may merit consideration by our en banc court.

As we have noted, Professor La Fave takes the position that "because first[-]degree murder requires a deliberate and premeditated killing, an accomplice is not guilty of this degree of murder *unless he* [or in this case, *she* ] *acted* with premeditation and deliberation." LA FAVE § 13.2(c), at 347. In other words, regardless of the principal's state of mind, the prosecution must prove beyond a reasonable doubt that the *aider and abettor* had the requisite specific intent.

Professor LaFave's approach is not a novel one. In *Savage v. State,* 18 Fla. 909

(1882), decided well over a century ago, the Supreme Court of Florida held that it was error to charge the jury in a premeditated murder case that if the alleged accomplice was present, aiding and abetting, then he was guilty of the same offense as the principal, namely, murder in the first degree. Rather,

> [t]he charge should be in effect that if James was present aiding and abetting Savage, knowing or believing that Savage intended to kill Paterson, or with a "premeditated design" to kill Paterson, aided and abetted Savage in his act, he was equally guilty with Savage.

> The reason is that one who is guilty of murder in the first degree must be charged and proved to the satisfaction of the jury to have done the act charged with a formed design to effect the death, and this is the law as to the principal in the second degree as well as in the first degree.

*Id.* at 962–63.

In *Leavine v. State,* 109 Fla. 447, 147 So. 897 (1933), the court, citing *Savage,* stated that

> premeditation is an essential element of murder in the first degree where the homicide is not committed in the perpetration of or an attempt to perpetrate rape, arson, robbery, etc. In order to hold one guilty of murder in the first degree who is personally present aiding and abetting a third person to commit the crime, *the person present rendering such aid must be shown himself to have had a premeditated design to effect the death of the person killed* or knew or believed that the third person who actually fired the fatal shot intended to kill the deceased. *See Savage* [ ] *v. State,* 18 Fla. 909 [1882].

> ... "Insofar as the instruction conveys the idea that Leavine was guilty of mur-

der in the first degree if he was personally present aiding Palmer to commit the murder[,] it was incorrect."

*Id.* at 904 (emphasis added).

More recently, in *Com. v. Bachert*, 499 Pa. 398, 453 A.2d 931 (1982), the court recognized that in order to prove that an accomplice was guilty of premeditated murder, the prosecution must establish "a specific intent to kill, harbored by the defendant at the time of the shooting." *Id.* at 935. "To determine the kind of homicide of which the accomplice is guilty, it is necessary to look to *his* state of mind; the requisite mental state must be proved beyond a reasonable doubt to be one *which the accomplice harbored and cannot depend upon proof of intent to kill only in the principal.*" *Id.* (emphasis added) (citing Lafave & Scott, Criminal Law (1972)). *Accord, Tharp v. Com.*, 40 S.W.3d 356, 365 (Ky.2000) (holding that the degree of an accomplice's guilt, both at common law and under applicable statutory provisions, is "determined by his or her own *mens rea* and not that of the principal"); *State v. Clemons*, 946 S.W.2d 206, 230 (Mo.1997) (holding that in first-degree murder prosecution of accomplice, jury must find that "both actors [*i.e.*, the principal and the

aider and abettor] had the necessary mental state—deliberation"; the prosecutor's argument to the contrary was improper, though reversal was not required).

Whether or not these authorities are persuasive, however, a division of this court is not free to follow them in light of contrary binding precedent in this jurisdiction. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971).[19] Thus, although the members of the division believe that en banc consideration of the issue may be warranted, we discern no error under current law in the instructions of the trial court challenged on this appeal.

## IV.

## CONCLUSION

For the foregoing reasons, all of both appellants' convictions are affirmed.

*So ordered.*[20]

---

**19.** We have stated that "[t]he rule of *stare decisis* is never properly invoked unless in the decision put forward as precedent[,] the judicial mind has been applied to and passed upon the precise question." *Murphy v. McCloud*, 650 A.2d 202, 205 (D.C.1994) (quoting *Fletcher v. Scott*, 201 Minn. 609, 277 N.W. 270, 272 (1938)). We do not think that this principle provides any solace to appellants. It is true that in *Byrd* and *Daniels*, the court was not asked to adopt the analysis of either Perkins or Lafave. The court in each of these cases did, however, identify as a part of its holding the elements that the prosecution must prove in order to establish that a defendant aided and abetted premeditated murder. The fact that a particular *argument* was not made to the court does not make the court's holding in either case any less a holding, nor

does it implicate the language of *Murphy v. McCloud.*

**20.** The remaining issues raised by the appellants do not require extensive discussion. In light of Ms. Wilson–Bey's arrival on the scene of the homicide armed with a butcher knife and accompanied by a group of other armed women, and her use of excessive force by repeatedly stabbing an unarmed victim, she was not entitled to an instruction on self-defense. *See Rowe v. United States*, 125 U.S.App. D.C. 218, 370 F.2d 240, 241 (1966); *Fersner v. United States*, 482 A.2d 387, 392–93 (D.C.1984). We also note that Ms. Wilson–Bey's attempts (after the stabbing of the decedent) to find additional victims casts light on her state of mind. The trial judge did not commit plain error in his response to the

jury's question regarding "transferred intent," or in instructing the jury on that issue. *See In re E.D.P.*, 573 A.2d 1307, 1308 (D.C.1990). The judge did not constructively amend the indictment in his instructions to the jury with respect to the conspiracy count, for "[i]t is well-settled that the elements of a charge in an [indictment] may be set forth in the conjunctive yet proven in the disjunctive, if that is the extent of the statutory requirement." *Carr v. United States*, 585 A.2d 158, 161 (D.C. 1991); *see also Ransom v. United States*, 630 A.2d 170, 174 n. 4 (D.C.1993). A motion for severance of defendants is addressed to the sound discretion of the trial court, with a presumption that codefendants are to be tried together; here, the judge did not abuse his discretion in denying Ms. Marbury's severance motion, for there was no appreciable possibility that "the conflict in [appellants'] defenses alone would sway the jury to find Ms. Marbury guilty." *See, e.g., Zafiro v. United States*, 506 U.S. 534, 538–39, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993); *Walker v. United States*, 630 A.2d 658, 663 (D.C.1993). The judge likewise did not abuse his discretion by not permitting Ms. Marbury's counsel to im-

peach Teresa Brown by omission regarding Ms. Brown's failure to tell the grand jury that Ms. Marbury had been "ranting and raving" and had threatened to return and "to kill that bitch." Ms. Brown was not asked a question regarding that subject before the grand jury, and she was appropriately cross-examined regarding her failure to report this alleged threat to the police. *See Mindombe v. United States*, 795 A.2d 39, 50 (D.C.2002) (discussing doctrine of impeachment by omission). Because Arnold Rucker, who was stabbed in the arm, incurred a wound from which much blood flowed, because Rucker testified that he suffered severe pain ("worse than getting shot") for a period of about two weeks, and because the wound left a two-inch scar on his arm, there was sufficient evidence of serious bodily injury, and the jury could therefore properly find appellants guilty of aggravated assault while armed. *Riddick v. United States*, 806 A.2d 631, 639 (D.C.2002). Finally, under the court's instructions as to the elements of the offense, we are satisfied that there was sufficient evidence to support both appellants' convictions of first-degree premeditated murder while armed.